# EXHIBIT B

## PROPOSED PRELIMINARY INSTRUCTIONS

### (DEFENSE REDLINE)

1.  Preliminary Instructions Before Trial, 1 Barbara E. Bergman, Criminal Jury Instructions for the District of Columbia § 1.102 (Matthew Bender, Rev. Ed.)[1]

2.  Notetaking by Jurors, Criminal Jury Instructions for the District of Columbia § 1.105

3.  Preliminary Instructions to Jury Where Identity of Alternates is Not Disclosed § 1.107

4.  A Juror's Recognition of a Witness or Other Party Connected to the Case § 1.108

5.  Unindicted or Unnamed Co-Conspirators[2]

Some of the people who may have been involved in these events are not on trial. This does not matter. There is no requirement that all members of a conspiracy be charged and prosecuted, or tried together in one proceeding.

## PROPOSED FINAL JURY INSTRUCTIONS

## PART ONE: GENERAL – INTRODUCTORY

6.  Furnishing the Jury with a Copy of the Instructions, Criminal Jury Instructions for the District of Columbia § 2.100

7.  Function of the Court, Criminal Jury Instructions for the District of Columbia § 2.101

8.  Function of the Jury, Criminal Jury Instructions for the District of Columbia § 2.102

9.  Jury's Recollection Controls, Criminal Jury Instructions for the District of Columbia § 2.103

10. Evidence in the Case, Criminal Jury Instructions for the District of Columbia § 2.104

11. Statements of Counsel, Criminal Jury Instructions for the District of Columbia § 2.105

12. Indictment Not Evidence, Criminal Jury Instructions for the District of Columbia § 2.106

---

[1] Hereafter, "Criminal Jury Instructions for the District of Columbia [§ sec. no.]"

[2] *See e.g.*, 6th Cir. Pattern Jury Instruction, § 3.06, Sample Standard Jury Instructions for the Eastern District of Michigan.

13. Burden of Proof, Criminal Jury Instructions for the District of Columbia § 2.107

14. Reasonable Doubt, Criminal Jury Instructions for the District of Columbia § 2.108

15. Direct and Circumstantial Evidence, Criminal Jury Instructions for the District of Columbia § 2.109

16. Nature of Charges Not to be Considered, Criminal Jury Instructions for the District of Columbia § 2.110

17. Number of Witnesses, Criminal Jury Instructions for the District of Columbia § 2.111

18. Inadmissible and Stricken Evidence, Criminal Jury Instructions for the District of Columbia § 2.112 (if applicable)

**PART TWO: EVALUATION OF TESTIMONY**

19. Credibility of Witnesses, Criminal Jury Instructions for the District of Columbia § 2.200

20. Police Officer's Testimony, Criminal Jury Instructions for the District of Columbia § 2.207

21. Right of Defendant Not to Testify, Criminal Jury Instructions for the District of Columbia § 2.208 (if applicable)

22. Defendant as Witness, Criminal Jury Instructions for the District of Columbia § 2.209 (if applicable)

23. False or Inconsistent Statement by Defendant, Criminal Jury Instructions for the District of Columbia § 2.210 (if applicable)

24. Effect of Refusal of Witness to Answer Question, Criminal Jury Instructions for the District of Columbia § 2.211 (if applicable)

25. Invocation of Fifth Amendment Privilege Against Self-Incrimination, Criminal Jury Instructions for the District of Columbia § 2.212 (if applicable)

26. Character of the Defendant, Criminal Jury Instructions for the District of Columbia § 2.213 (if applicable)

27. Cross-Examination of Character Witness, Criminal Jury Instructions for the District of Columbia § 2.214 (if applicable)

28. Evaluation of Prior Inconsistent Statement, Criminal Jury Instructions for the District of Columbia § 2.216 (if applicable)

2

29. Evaluation of Prior Consistent Statement, Criminal Jury Instructions for the District of Columbia § 2.217 (if applicable)

**PART THREE: EVALUATION OF OTHER EVIDENCE**

30. Statements of the Defendant—Substantive Evidence, Criminal Jury Instructions for the District of Columbia § 2.305

31. Statements of the Defendant—Corroboration, Criminal Jury Instructions for the District of Columbia § 2.306

32. Motive, Criminal Jury Instructions for the District of Columbia § 2.307

33. Transcripts of Tape Recordings, Criminal Jury Instructions for the District of Columbia § 2.310 (if applicable)

34. Other Crimes Evidence, Criminal Jury Instructions for the District of Columbia § 2.321 (if applicable)

**PART FOUR: ASPECTS OF DELIBERATIONS**

35. Multiple Defendants—Multiple Counts, Criminal Jury Instructions for the District of Columbia § 2.404

36. Unanimity—General, Criminal Jury Instructions for the District of Columbia § 2.405

37. Verdict Form Explanation, Criminal Jury Instructions for the District of Columbia § 2.407

**PART FIVE: CLOSING REMARKS**

38. Redacted Exhibits, Criminal Jury Instructions for the District of Columbia § 2.500 (if applicable)

39. Exhibits during Deliberations, Criminal Jury Instructions for the District of Columbia § 2.501

40. Selection of Foreperson, Criminal Jury Instructions for the District of Columbia § 2.502

41. Possible Punishment not Relevant, Criminal Jury Instructions for the District of Columbia § 2.505

42. Cautionary Instruction on Publicity, Communication, and Research, Criminal Jury Instructions for the District of Columbia § 2.508

43. Communications Between Court and Jury During Jury's Deliberations, Criminal Jury Instructions for the District of Columbia § 2.509

44. Attitude and Conduct of Jurors in Deliberations, Criminal Jury Instructions for the District of Columbia § 2.510

45. Excusing Alternate Jurors, Criminal Jury Instructions for the District of Columbia § 2.511

## PROPOSED DEFINITIONS AND THEORIES OF LIABILITY

46. Proof of State of Mind, Criminal Jury Instructions for the District of Columbia § 3.101

47. Willfully Causing an Act to be Done, Criminal Jury Instructions for the District of Columbia § 3.102

48. "On or About," Criminal Jury Instructions for the District of Columbia § 3.103 (if applicable)

## PROPOSED OFFENSE INSTRUCTIONS

49. Conspiracy: Basic Instruction, Criminal Jury Instructions for the District of Columbia § 7.102

Count One of the Indictment charges the Defendants, Yongchul "Charlie" Kim and Meghan Messenger, with conspiracy to commit bribery. Title 18, United States Code, Section 371, makes it a crime to conspire with someone else to commit an offense made illegal by federal law. It is against the law to agree with someone to commit the crime of bribery.

The charge of conspiracy to commit bribery is a separate charge from bribery itself with which each Defendant also is charged.

The Government is not required to prove that the objective was achieved.

The elements of conspiracy, each of which the Government must prove beyond a reasonable doubt, are that:

1.      Between September 2020 through October 2022, an agreement existed between two or more people to commit the crime of bribery. This does not have to be a formal agreement or plan, in which everyone involved sat down together and worked out the details. On the other

hand, merely because people get together and talk about common interests, or do similar things does not necessarily show that an agreement exists to commit bribery. It is enough that the Government proves beyond a reasonable doubt that there was a common understanding among those who were involved to commit the crime of bribery. So, the first thing that must be shown is the existence of an agreement.

2.    The Defendant intentionally joined in that agreement. It is not necessary to find he agreed to all the details of the crime, or that he knew the identity of all the other people the Government has claimed were participating in the agreement. A person may become a member of a conspiracy even if that person agrees to play only a minor part, as long as that person understands the unlawful nature of the plan and voluntarily and intentionally joins in it with the intent to advance or further the unlawful object of the conspiracy. Even if the Defendant was not part of the agreement at the very start, he can become a member of a conspiracy later if the Government proves that he intentionally joined the agreement. Different people may become part of the conspiracy at different times. But mere presence at the scene of the agreement or of the crime, or merely being with the other participants, does not show that the Defendant knowingly joined in the agreement. Also, unknowingly acting in a way that helps the participants, or merely knowing about the agreement itself, without more, does not make the defendant part of the conspiracy. So the second thing that must be shown is that the Defendant was part of the conspiracy.

3.    One of the people involved in the conspiracy knowingly committed ~~did something for the purpose of carrying out the conspiracy. This something is referred to as an overt act.~~ at least one overt act, in order to accomplish some object or purpose of the conspiracy.

Overt Acts

In this case, the charged overt acts are:

1.      On September 23, 2020, Kim, copying Messenger, emailed Burke, despite having been instructed by the Navy not to.  Kim asked for "insights or guidance" about a Navy contract for Company A.  Burke responded that he would get back to Kim and Messenger, but never did.

2.      On February 19, 2021, Kim emailed Burke, asking to connect for "at least an hour or so to catch up," and promoting Company A's training program.

3.      On February 24, 2021, Kim emailed Burke, stating "I know you must be very busy," but requesting "an hour of your time[.]"  Kim again promoted Company A.  Burke responded that an aide would schedule a meeting "in the next week or two."

4.      On March 5, 2021, Kim, copying Messenger, emailed Burke, noting that Company A planned to open a new headquarters in New York City that summer, and inviting Burke and his spouse to visit.

5.      On April 20, 2021, Kim and Messenger spoke with Burke via WhatsApp.  Describing the call afterward, Kim stated that Burke "wants to work for us but we're asking for a deal first" and that while Messenger "felt slimy," Kim "was nervous but calm."

6.      On May 6, 2021, Burke directed Person 2 to find money for a future contract for Company A from U.S. Naval Forces Europe and Africa.  Burke also told Kim and Messenger that Person 2 was "working options and angles hard for funding our project[.]"

7.      On May 10, 2021, Kim, copying Messenger, emailed Burke to propose a $20 million contract for Company A to provide workforce training for Burke's command — even

though U.S. Naval Forces Europe and Africa had not identified a need for such training or requested that companies submit bids for such a contract.

8.     On July 13, 2021, Kim, Messenger, and Burke agreed to meet ten days later in Washington, D.C.

9.     On July 23, 2021, Kim, Messenger, Burke (while on duty), and Person 3 had lunch in Washington, D.C., paid for by Company A, during which Kim and Messenger proposed that:

    a.   Burke use his official position to steer a workforce training contract from U.S. Naval Forces Europe and Africa to Company A;

    b.   Burke remain in the Navy for approximately six months after Company A performed the contract and, pointing to its performance, influence senior Navy officers to award another contract to Company A—to train a larger portion of the Navy—before Burke retired; and

    c.   In exchange, Kim and Messenger offered Burke a job at Company A—at a salary of at least $500,000 per year plus stock options and other related compensation—to commence after Burke retired from the Navy, which Burke agreed to accept.

10.    On November 16, 2021, Burke (while off duty) met with Kim and Messenger at Company A's headquarters in New York City. Describing the meeting afterward, Kim stated, "we're about to go full force back into business with the Navy," and Burke would aim to have a contract in place and signed before Christmas. Kim stated the contract would include in-person training to Burke's command in Naples, Italy, and Rota, Spain in early 2022.

11.    On December 16, 2021, Kim, copying Messenger, emailed Burke, attaching a "Pricing worksheet" that listed a total price of $413,500 for Company A's training: $213,500 for the training, plus a $200,000 surcharge to give it in person in Italy and Spain.

7

12.    On December 17, 2021, Burke ordered Person 2 to provide a contract to Company A, to make sure the contract was in place by January 10, 2022, and for it to be valued at approximately $350,000.

13.    On December 20, 2021, Burke emailed Kim and Messenger, stating that his staff could not implement a contract by January 10, 2022. The same day, Kim replied asking, "for the sake of speed," that Burke consider issuing the contract to Company A through Company B.

14.    On December 21, 2021, Kim, copying Messenger, again told Burke that Company A could get the contract through OPM and Company B. Kim added, "we prefer to get this done as soon as possible." The same day, Burke replied, "We'll work with both and take the fastest route."

15.    On December 27, 2021, U.S. Naval Forces Europe and Africa submitted a Military Interdepartmental Purchase Request ("MIPR") to OPM. The MIPR ordered a training program that would include applications only Company A provided; thus, the MIPR was actually a sole-source contract. The MIPR required the training program to occur on January 10, 2022, in Naples, Italy, and Rota, Spain. The value of the MIPR was $355,135.

16.    On January 5, 2022, OPM sent Company B a task order based on the requirements stated in the MIPR. The order included a travel allowance of $13,200.

17.    Company B later contracted with and paid Company A approximately $257,000 related to this task order.

18.    From January 8 to January 15, 2022, Company A employees, including Kim and Messenger, traveled to Naples, Italy, and Rota, Spain, and provided the "On My Mind" training to personnel under Burke's command pursuant to the MIPR.

19.    Burke remained in the Navy and promoted Company A to senior Navy officers— while suggesting another contract for Company A to train a larger portion of the Navy—without disclosing his prior employment offer from Kim and Messenger.  For example:

a.    On March 12, 2022, Burke emailed a Foreign Military Officer asking him/her to report back about the Foreign Military's efforts to contract with Company A because such information would advance Company A's efforts to market Company A to a wider U.S. Navy audience.

b.    On March 14, 2022, Burke sent an email introducing Kim and Messenger to Person 4, a four-star Navy Admiral who oversaw training programs for Navy recruits' "pipeline schools."  Burke promoted Company A's training program to Person 4.

c.    On March 28, 2022, Burke forwarded an email to Person 4 that contained a proposal for Company A to provide training to the Foreign Military.  Burke commented that the Foreign Military's proposal had "sort of the same components I would see us using."

d.    On May 25, 2022, Burke emailed a Senior Foreign Military Official, stating, "I wanted to write you a short note on [Company A]—something I know the [Foreign Military] is exploring."  Burke promoted Company A's training, said that he had "put together a proposal for wider US Navy implementation," and added, "my team is standing by as your local US Navy team to help in any way as the [Foreign Military] considers a similar path."

20.    The conspiracy was concealed from the Navy through misleading and false statements and material omissions. For example:

a.    On August 26, 2021 (about one month after Burke met in Washington, D.C.), Burke sent the Secretary of the Navy a memo requesting voluntary retirement in May 2022.    Burke also affirmed that he had "read and thoroughly examined DOD Directive 5500.07R concerning pre- and post-retirement standards of conduct and employment activities," falsely implying that Burke had been and would continue to follow those standards.

b.    On March 28, 2022, Burke emailed a Navy Ethics Counselor, and falsely stated, with respect to post-Government employment, that he "had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July."

c.    On May 6, 2022, Burke emailed the Navy Ethics Counselor, falsely implying that Company A had just approached him to ask "if I would be interested in having post-Navy employment discussions," and falsely stating that he told Company A that "I could not, had some prerequisites to meet and would get back to them if/when I met those prerequisites."    Burke disclosed that U.S. Naval Forces Europe and Africa had given Company A the contract discussed above, but he also falsely claimed the contract decision was through Person 2.

d.    On May 9, 2022, Burke signed a memorandum to the Navy's Chief of Naval Operations with the subject line "DISQUALIFICATION STATEMENT (EMPLOYMENT)".    The memorandum stated, "I anticipate commencing discussions related to employment with the company listed below . . . [Company

10

~~A]," even though he already negotiated for and obtained a promise of employment at Company A from Kim and Messenger.~~

~~e.  On July 18, 2022, Burke submitted to the Office of Government Ethics in Washington, D.C., an "Executive Branch Personnel Public Financial Disclosure Report (OGE Form 278e)."  In a section called "Filer's Employment Agreements and Arrangements," Burke stated that he had "tentatively accepted a job offer from [Company A]" and "Disqualification memo signed 9 May 22.  Letter of offer received 24 May and accepted 26 May 22."  Burke e-signed the document, "certify[ing that] the statements I have made in this form are true, complete and correct to the best of my knowledge"  even though the form did not include any information about his prior job discussions with Kim and Messenger.~~

~~21.  In or about October 2022, Burke began employment as a "Senior Partner" at Company A and by January 2023 had received gross compensation of about $125,000.~~

~~The Government need not prove that all of these overt acts were taken, but in order to find Defendant Kim and Defendant Messenger guilty, you must all agree on at least one overt act that was done.~~

<u>Existence of a Conspiracy</u>

A conspiracy can be proved indirectly, by facts and circumstances that lead to a conclusion that a conspiracy existed. The Government must prove that such facts and circumstances existed and that they lead to the conclusion that a conspiracy existed.

In determining whether a conspiracy between two or more persons existed and whether the Defendant was one of its members, you may consider the acts and the statements of any other members of the conspiracy as evidence against the Defendant whether done in or out of his

presence while the conspiracy existed. When persons enter into an agreement to commit a crime, they become agents for each other so that everything which is said or done by one of them in furtherance of that purpose is deemed to be the statement of all who have joined in that conspiracy and is evidence against all of the conspirators. However, statements of any conspirator which are made before its existence or after its termination may be considered as evidence only against the person making such statements.

In summary, a conspiracy is a kind of partnership in crime. For any defendant to be convicted of the crime of conspiracy, the Government must prove three things beyond a reasonable doubt: first, that between September 2020 and October 2022 there was an agreement to commit bribery; second, that the Defendant intentionally joined in that agreement; and third, that one of the people involved in the conspiracy did one of the overt acts charged.

50. Bribery[3]

Count Two of the Indictment charges the Defendants with bribery. Title 18, United States Code, Section 201(b)(1) makes it a crime to bribe a public official. For you to find Defendant Kim and Defendant Messenger guilty of this offense, the Government must prove each of the following beyond a reasonable doubt:

1. The Defendant, directly or indirectly, gave, offered, or promised something of value to Robert Burke;

---

[3] *See United States v. Burke*, 24-CR-265, 05/13/25 PM Trial Tr. at 102:2-107:2. *See also United States v. De Moya*, Crim. No. 19-158 (RBW), Doc. 232 at 32 (D.D.C. June 5, 2023) (Final Jury Instructions); Bribery, Criminal Jury Instructions for the District of Columbia § 6.120; 18 U.S.C. § 201; *see also McDonnell v. United States*, 579 U.S. 550 (2016).

2.   Robert Burke was, at the time, a public official. The term "public official" includes an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof;

2.3.the Defendant acted corruptly; and

3.4.that the Defendant did so corruptly, that is the Defendant intended that, in exchange for a thing of value, Robert Burke would be influenced in the performance of an official act.

<u>Corruptly – Defined</u>

The term "corruptly," as used in these instructions, means having an improper, wrongful motive or purpose. and  The motive to act corruptly is ordinarily a hope or an expectation of either prohibited financial gain or other benefit to oneself or some prohibited profit or benefit to another. requires that the defendant acted with consciousness of wrongdoing and knowledge that his conduct was unlawful.  A person cannot act "corruptly" unless that person was conscious that his conduct was wrongful.  Good faith belief that conduct is lawful or reasonable reliance on government official guidance, even if ultimately incorrect, negate corrupt intent.  A person acts corruptly if they give, offer, or promise something of value to a public official with the intent to influence an official act.

<u>Official Act - Defined</u>

The term "official act" means any decision or action on any question, matter, cause, suit, proceeding, or controversy, which may at any time be pending, or which may by law be brought before any public official, in such public official's official capacity or in such official's place of

trust. The Government must prove beyond a reasonable doubt that the Defendant intended to influence a specific act or acts.

In order to find the Defendant guilty of violating the bribery statute by giving, offering, or promising a bribe in exchange for influencing an official act, you must identify one or more specific questions, matters, causes, suits, proceedings, or controversies that involve the formal exercise of Governmental power, such as a determination before an agency. A question, matter, cause, suit, proceeding, or controversy must be something specific and focused that either was pending or might by law have been brought before any public official. In this case, the Government alleges that the question, matter, cause, suit, proceeding, or controversy is [Company A]'s January 2022 contract with the United States Government.

In order to find the Defendant guilty of violating the bribery statute by giving, offering, or promising a bribe in exchange for influencing an official act, you must also find that in exchange for the bribe, you must also find that in exchange for the bribes, the Defendant intended that a public official make a decision, take an action, or agree to make a decision or take an action on the identified question, matter, cause, suit, proceeding, or controversy. A decision or action on a qualifying step for a question, matter, cause, suit, proceeding, or controversy would qualify as an official act.  Action on the matter includes the Defendant using his official position to exert pressure on another official, or by advising another official to take action, knowing or intending that such advice will form the basis for an official action by another official. Setting up a meeting, hosting an event, or talking to another official, without more, does not qualify as a decision or action on a question, matter, cause, suit, proceeding, or controversy. Simply expressing support for a matter does not qualify as a decision or action, as long as the public official does not intend

to exert pressure on another official or provide advice, knowing or intending such advice to form the basis for an official act.

You may consider all of the evidence in this case, including the nature of the transaction, in determining whether the conduct involved an official act.

<u>Proof of Success Not Required</u>

For a defendant to be guilty of bribery by giving, offering, or promising a thing of value, the Government must prove beyond a reasonable doubt that the defendant intended that, in exchange for a thing of value, an official act would be influenced. It is not necessary that the government prove an official act actually was influenced.[4]

<u>Exchange Need Not Be Explicit</u>

The Defendant's intent to engage in the exchange of a bribe for an official act need not be explicit. Otherwise, the law's effect could be frustrated by knowing winks and nods. Rather, the Government can prove the Defendant's intent by circumstantial evidence, based on his words,

---

[4] *See McDonnell*, 136 S. Ct. at 2370-71 ("Under this Court's precedents, a public official is not required to actually make a decision or take an action on a 'question, matter, cause, suit, proceeding or controversy'); *Evans v. United States*, 504 U.S. 255, 268 (1992) (considering bribery under the Hobbs Act, 18 U.S.C. § 1951, and noting "fulfillment of the *quid pro quo* is not an element of the offense.") *United States v. Orenuga*, 430 F.3d 1158, 1166 (D.C. Cir. 2005) (approving district court's instruction that, "[i]t is not a defense to the crime of bribery that had there been no bribe, the public official might have lawfully and properly performed the same act."); *see also United States v. Quinn*, 359 F.3d 666, 675 (4th Cir. 2004) ("[I]t does not matter whether the Government official would have to change his or her conduct to satisfy the payor's expectations."); *United States v. Jannotti*, 673 F.2d 578, 601 (3d Cir. 1982) ("It is neither material nor a defense to bribery that 'had there been no bribe, the (public official) might, on the available data, lawfully and properly have made the very recommendation that (the briber) wanted him to make.'" (*quoting United States v. Labovitz*, 251 F.2d 393, 394 (3d Cir. 1958))).

conduct, acts, and all the surrounding circumstances and the rational or logical inferences that may be drawn from them.[5]

### Mixed Motive Not a Defense

Finally, it is not a defense to the crime of bribery that Defendant Kim and Defendant Messenger gave, offered, or promised Robert Burke a thing of value, for some purpose in addition to influencing Robert Burke's officials act or acts. This is so because people rarely act for a single purpose. If you find beyond a reasonable doubt that a Defendant acted with ~~the corrupt~~ a wrongful purpose and with the intent to exchange a thing of value for an official act, then it makes no difference that the Defendant may also have had additional motives—such as friendship or goodwill.[6]

### Goodwill Gifts

Not every gift or thing of value given to a public official amounts to a bribe. Under the law, giving a gift or thing of value to a public official because of his office, to cultivate friendship, or to build goodwill in hopes of ultimately affecting one or more unspecified official acts, now or in the future, is not federal bribery. For bribery, there must be a *quid pro quo*—a specific intent

---

[5] *See Evans v. United States*, 504 U.S. at 274.

[6] *See United States v. Wright*, 665 F.3d 560, 572 (3d Cir. 2012) ("[F]riendship is no bar to an honest services fraud conviction."); *United States v. Bryant*, 655 F.3d 232, 245-46 (3d Cir. 2011) (approving instruction that the jury may find a payment was a bribe "even if you also find it was paid, in part, for legitimate work if it was also paid, in part, in return for [the public official's] official action"); *United States v. Donna*, 366 Fed. App'x 441, 448-49 (3d Cir. 2010) (refusing to find error in a dual motive instruction on extortion under color of official right in which the court used friendship as an example of a neutral motive).

to give or receive something of value in exchange for an official act, as I have defined for you a few minutes ago.

Payments or benefits, made with no more than some generalized hope or expectation of ultimate benefit on the part of the donor are thus not bribes, since they are made neither with the intent to engage in a relatively specific *quid pro quo* with an official nor for or because of a specified official act.  As to each defendant, you should consider whether that defendant intentionally gave anything to Robert Burke as part of an intended exchange for an official act. Thus, if you find that any defendant gave a thing of value to Robert Burke as a show of goodwill or, for example, as a token of friendship, but not in exchange for an official act, then you must acquit that defendant.

## EXPLANATION FOR DEFENDANTS' PROPOSED REVISIONS TO THE JURY INSTRUCTIONS

**49. Conspiracy Instruction**

**Overt Acts (pages 6-11)**

This Court should omit the list of alleged overt acts on pages 6 through 11, 3.1 through 3.21. Such a lengthy oral listing presents the alleged acts as established facts, is highly prejudicial, and is inconsistent with the Criminal Jury Instructions for the District of Columbia. The Court should instead simply instruct the jury that it must unanimously find an overt act was knowingly committed to accomplish some object or purpose of the conspiracy.

The government's proposed instruction presents the alleged acts as established facts rather than allegations the government must prove beyond a reasonable doubt. By reciting these acts as if they were proven, the instruction improperly shifts the burden of proof from the government to the defendants. The jury is likely to understand the Court's detailed recitation of these acts as judicial confirmation of their occurrence, thereby relieving the government of its constitutional obligation to prove each element of the conspiracy charge.

Any description of the overt acts would be unduly prejudicial to the defendants. Many of the overt acts listed are perfectly lawful business activities that will not be disputed by the defendants at trial. By focusing the jury's attention on this extensive list through the court's oral instruction, the proposed instructions create a misleading impression that establishing any of these routine business acts satisfies the government's burden on the conspiracy charge. There is a reasonable likelihood that the jury will conflate proof of these undisputed lawful acts with proof of the criminal agreement and the requisite intent that actually constitute the elements of conspiracy, leading to a conviction based on lawful conduct rather than criminal purpose. *Jones v. United States*, 527 U.S. 373, 390 (1999). Moreover, given the number of overt acts, the listing

will dominate the jury's understanding of the instructions and improperly overshadow the essential elements of criminal intent and unlawful agreement that actually distinguish routine business relationships from criminal conspiracy. The prejudicial effect of presenting this laundry list of mostly innocuous business activities as if they were inherently suspicious substantially outweighs any probative value, particularly when the jury instructions should focus on the mental state elements that determine guilt or innocence.

Removing the listing of the overt acts is also consistent with the Criminal Jury Instructions for the District of Columbia. The Criminal Jury Instructions provide that, in a case like this one, that charges a conspiracy pursuant to 18 U.S.C. § 371 with multiple overt acts, courts are not required to list the overt acts, but instead "may prefer to provide, as an appendix, the list of overt acts that the jury may consider." 1 Criminal Jury Instructions for DC Instruction 7.102 (2025). Further, "[t]he jury should be instructed that the appendix is not evidence but is provided merely as an aid to the jury." *Id.* The Criminal Jury Instruction explain that "[c]are should be taken in this area to give the jury only the information that it needs in order to discharge its responsibilities. There has always been a tendency to 'over instruct' in conspiracy cases and, perhaps, 'overload' the jury with accurate, but non-essential information." *Id.* (citing 2 O'Malley, Grenig & Lee, *Federal Jury Practice and Instructions*, § 31:02(C) (5th ed. 2000)). Here, listing all of the overt acts, even though not legally required and prejudicial, would over instruct and overload the jury.

The Court should instead simply instruct the jury that it must unanimously find an overt act was knowingly committed to accomplish some object or purpose of the conspiracy.

**50. Bribery Instruction (pages 13 and 16)**

The proposed edits to the bribery instruction under 18 U.S.C. § 201(b) are necessary to ensure the jury evaluates each statutory requirement distinctly and in accordance with governing law. *See* Dkt Nos. 115, 135, 195. The statute imposes two separate mens rea elements: (1) that the defendant acted *corruptly*, and (2) that the defendant acted *with intent to influence* an official act. The government's proposed instruction conflates these elements, undermining the structure of the statute and recent Supreme Court precedent. In *Snyder v. United States*, 603 U.S. 1, 11 (2024), the Court made clear that § 201(b) requires "the corrupt state of mind *and* the intent to be influenced in the official act." (emphasis added). These are distinct and cumulative requirements that must each be proven beyond a reasonable doubt.

Movants' proposed definition of "corruptly"—as acting with *consciousness of wrongdoing*—faithfully reflects that requirement. This definition is consistent with decades of statutory construction, Supreme Court precedent, and circuit authority . In *Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005), the Court explained that "corruptly" refers to conduct that is wrongful, immoral, depraved, or evil. Numerous courts have followed that approach, interpreting "corruptly" to require a knowing and dishonest purpose. *See, e.g.*, *United States v. Puma*, 596 F. Supp. 3d 90, 103 (D.D.C. 2022); *United States v. Ng Lap Seng*, 934 F.3d 110, 142 n.32 (2d Cir. 2019); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013). This view is also endorsed by the Justice Department itself. In *Snyder*, the Solicitor General told the Supreme Court that "corruptly" imposes a "major limiting feature" requiring a "wrongful, immoral, depraved, or evil" state of mind. *See* Br. for U.S., 2024 WL 1116453, at *38–39. Pattern instructions from the Fifth, Tenth, and Eleventh Circuits likewise define "corruptly" as acting knowingly and dishonestly for a wrongful purpose. *See, e.g.*, 5th Cir. Pattern Jury Instruction 2.09A (2024) ("An

act is 'corruptly' done if it is done intentionally with an unlawful purpose"); 10th Cir. Pattern Jury Instruction 2.11 (Feb. 7, 2025) (listing separate elements for "corruptly" and "intentionally ... to influence an official act"); 11th Cir. Pattern Jury Instr. O5.1 (2024) ("To act 'corruptly' means to act knowingly and dishonestly for a wrongful purpose.").

Properly instructing the jury on these elements is not only doctrinally required but constitutionally necessary.  The Fifth and Sixth Amendments guarantee that a jury, not the court, must find each element of the offense beyond a reasonable doubt.  *United States v. Gaudin*, 515 U.S. 506, 510 (1995).  Misstating and collapsing the "corruptly" requirement undermines this constitutional safeguard.  The government concedes it must prove Movants acted "corruptly," yet its instruction deprives the jury of the ability to make that finding separately and clearly.

**Goodwill Gifts**

The Court should also include an instruction on goodwill gifts to ensure the jury properly distinguishes between lawful business courtesies and criminal bribes.  The Supreme Court has recognized that there is a crucial distinction between criminal bribes and permissible gifts that may be "motivated, at least in part, by the recipient's capacity to exercise governmental power or influence in the donor's favor" without necessarily being connected to a particular official act.  *United States v. Sun-Diamond Growers of California*, 526 U.S. 398, 406 (1999).  This distinction is particularly important in this case, where the evidence will show routine business relationship-building activities that are standard in the defense contracting industry.  Without proper guidance, the jury may incorrectly conclude that *any* benefit or courtesy extended to a government official constitutes criminal conduct.  The instruction should clarify that gifts or benefits motivated by friendship, general goodwill, or standard business courtesy—rather than a corrupt intent to influence specific official acts—do not satisfy the intent elements of bribery.  Such an instruction

was given in, for example, *United States v. Menendez*, 23 Cr. 490 (SHS) (S.D.N.Y.), Dkt. No. 583 (Tr. at 7092). The instruction is essential to prevent the jury from criminalizing the type of legitimate relationship-building that the Supreme Court has recognized as distinct from bribery, and to ensure that only conduct accompanied by the requisite intents results in conviction.

**Defense Theory of the Case Instruction**

The Court should also give a defense theory of the case instruction, to be provided by the defendants during the pendency of the trial. *E.g. United States v. Howard*, 245 F. Supp. 2d 24, 39 (D.D.C. 2003) ("A defendant in a criminal case is entitled to adequate jury instructions on his theory of defense, provided that there is evidence to reasonably support such a theory."); 1 Criminal Jury Instructions for DC Instruction 9.100 (2025) ("A defendant is generally entitled to an instruction on his theory of the case.").