UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Case No. 24-cr-265 (2)(3) (TNM) |
| | : | |
| YONGCHUL "CHARLIE" KIM and MEGHAN MESSENGER, | : : | |
| | : | |
| Defendants. | : | |

UNITED STATES' REPLY IN SUPPORT OF ITS NOTICE OF INTENT
TO USE EVIDENCE UNDER FED. R. EVID. 404(B)

Pursuant to Federal Rule of Evidence 404(b), the government noticed a series of communications between Kim, Messenger, and Senior Officer 1 that occurred during and around the period of Kim and Messenger's charged conspiracy with former United States Navy Admiral Robert Burke. ECF No. 180. These communications were part of Kim and Messenger's ongoing illegal bribery scheme, which involved them: (1) cultivating relationships with high ranking military officials in a position to direct lucrative government contracts to Company A; (2) offering employment with Company A when the officials retired from the military; and (3) tying the offer of employment to the official providing a government contract while they were in uniform, which they could service and expand upon retirement. Indeed, the government's proffered communications between Kim, Messenger, and Senior Officer 1 are directly relevant to proving that Kim and Messenger's illegal conduct with respect to Burke was knowing, intentional, planned, not the result of mistake, and motivated by their desire to make inroads with the various branches of the U.S. military. The defendants' conduct was simply part of their corrupt business strategy: cultivate, entice, and bribe.

In their Opposition, ECF No. 199, Kim and Messenger do not address the permissible bases upon which the government seeks to admit the proffered evidence. Instead, they argue that the evidence is being proffered solely to show their criminal propensity, and that any probative value of the evidence is outweighed by the dangers of unfair prejudice, confusion, and delay. These arguments are not supported by the facts or the law. For reasons previously explained in the government's Rule 404(b) Notice, and discussed further below, the evidence should be admitted.

I. **THE EVIDENCE IS PROBATIVE OF NUMEROUS MATERIAL ISSUES THAT ARE UNRELATED TO KIM AND MESSENGER'S CHARACTER OR PROPENSITY TO ENGAGE IN CRIMINAL ACTS.**

Kim and Messenger argue that the evidence should be excluded because "[t]he government has not offered any plausible, non-propensity reason for seeking" its introduction. ECF No. 199 at 13. This is false. As the government explicitly stated in its Rule 404(b) Notice, the evidence is being offered to establish Kim and Messenger's knowledge, intent, motive, plan, and absence of mistake. ECF No. 180 at 9-12. Tellingly, the Opposition fails to address why the proffered evidence would not be admissible for any of these purposes. Failing to address the government's permissible bases for admission, Kim and Messenger simply condemn the proffered evidence as "classic, impermissible propensity evidence." ECF No. 199 at 13. Yet they fail to acknowledge that "*any* purpose for which bad acts evidence is introduced is a proper purpose so long as the evidence is not offered *solely* to prove character." *United States v. Cassell*, 292 F.3d 788, 795 (D.C. Cir. 2002) (citation omitted) (emphasis in original).

Here, as set forth in the government's Rule 404(b) Notice, the proffered evidence is probative of Kim and Messenger's intent, knowledge, plan, absence of mistake, and motive as to the charged conspiracy with Burke. ECF No. 180 at 9-12. For instance, at trial it is likely that the defendants will claim that it was just happenstance that a discussion of future post-government employment for Burke and the procurement of a contract with the Navy for Company A both

2

occurred during the meeting at Belga Café. However, the proffered evidence can be offered "to show a pattern of operation that would suggest intent[.]" *United States v. Long*, 328 F.3d 655, 661 (D.C. Cir. 2003) (citation omitted). That Kim and Messenger repeatedly sought to have Senior Officer 1 assist them with obtaining a lucrative military contract, while at the same time discussing the prospect of his future employment with Company A, and then doubled down on those efforts immediately after Burke failed to deliver his promised second contract with the Navy, clearly "tends to undermine [any] innocent explanation" as to their interactions with Burke. *Id.* Stated simply, evidence that Kim and Messenger discussed possible future employment with a senior military officer who was positioned to tip the scales in their favor to obtain a military contract tends to show that, whatever innocent explanation they may offer for their conduct with Burke, it was not an inadvertent mistake.

The proffered evidence also shows that their illegal agreement with Burke was part of a consistent plan. Just as Burke was tasked with obtaining an initial contract with the Navy in order to get Company A's foot in the door before he retired, with the expectation that he would then leverage that initial contract to obtain a larger contract or contracts after he began working at Company A, so too was the plan to have Senior Officer 1 secure an initial contract before his pending retirement ("The objective is for him to take the last 4 months of his time at the AirForce to help introduce us to a couple groups that can approve a 1,000 person pilot ($1 mm contract size)"), and then continue as Company A's point person to obtain additional contracts following his retirement ("More opportunities he's pursuing and the goal is for him to lead the work with the AirForce on the ground for us. So he would be a consultant helping us run AF work.").

The proffered evidence is also probative of Kim and Messenger's motive in offering Burke a job for a contract, in that their interactions with Senior Officer 1 underscore their multifaceted

3

efforts to prop up their failing leadership training business by leveraging their contacts within the U.S. military. Because the government's evidence is being offered for permissible non-propensity purposes, and because Kim and Messenger fail to even attempt to rebut these proper purposes, the government's proffered 404(b) evidence should be admitted.

## II. THE EVIDENCE IS HIGHLY RELEVANT.

Having glossed over the question of whether the evidence is being offered for a permissible non-propensity purpose, Kim and Messenger next contend that "[a]ny probative value of the [evidence] is massively outweighed by the danger of confusing the issues, unfair prejudice to Defendants, and undue delay." ECF No. 199 at 14. The primary basis of Kim and Messenger's position that the evidence lacks probative value apparently is their belief that they "did nothing wrong in connection with their dealings with Senior Officer 1[,]" and that those dealings did not constitute "criminal activity[.]" *Id.* But whether their dealings with Senior Officer 1 were charged or otherwise criminal is irrelevant to the question of the admissibility of that evidence under Rule 404(b). "Rule 404(b)'s terminology 'other crimes, wrongs, or acts' includes conduct that is neither criminal nor unlawful if it is relevant to a consequential fact[, and t]he other activity need not have resulted in a charge or conviction; indeed, the defendant may even have been acquitted of the conduct, or the conduct may have been entirely lawful." *Long*, 328 F.3d at 661 (citations omitted); *see also United States v. Dennis*, 497 F.3d 765, 768 (7th Cir. 2007) ("Rule 404(b) does not exclude evidence of 'other acts' that are not criminal."); *United States v. Devin*, 918 F.2d 280, 286 (1st Cir. 1990) ("Rule 404(b) allows evidence of 'crimes, wrongs, or acts' to be introduced. This disjunctive terminology shows unmistakably that Rule 404(b) reaches conduct which is neither criminal nor unlawful so long as the conduct is probative of, and revelatory as to, a permitted purpose."); *United States v. Miller*, 573 F.2d 388, 392 (7th Cir. 1978) ("[T]he structure and language of [Rule 404(b)] indicate that it includes conduct that is neither criminal nor wrongful[.]").

Yet Kim and Messenger misapprehend the standard for admitting Rule 404(b) evidence as requiring the government to prove by a preponderance of the evidence that they and Senior Officer 1 committed or attempted to commit a crime through their communications, or otherwise engaged in illegal activity. *See* ECF No. 199 at 16 ("[T]he evidence does not show, by a preponderance or otherwise, that Defendants sought to engage in the alleged other criminal misconduct."). Again, proof of criminality is not required, and here the government easily meets its burden of proving by a preponderance of the evidence that Kim, Messenger, and Senior Officer 1 discussed Senior Officer 1's possible employment with Company A at or around the same time as the charged conspiracy with Burke, and at or around the same time that Senior Officer 1 was promoting Company A's services within the military and otherwise attempting to direct government contracts to Company A. The evidence on which the government relies is literally Kim's, Messenger's, and Senior Officer 1's own written communications. There can be no question that those communications occurred, which is more than enough to clear the relatively low burden of a preponderance of the evidence.

Kim and Messenger also contend that the probative value of the proffered evidence is low because their conduct with Burke and their conduct with Senior Officer 1 "involved different people, organizations, courses of alleged conduct, and time periods," and the proffered evidence "involves conduct that occurred *after* the July 2021 meeting between Defendants and Adm. Burke[.]" ECF No. 199 at 17 (emphasis in original). Yet the similarities between the two sets of conduct are striking—in both instances Kim and Messenger interacted directly with a senior U.S. military officer, fostered relationships with those senior officers during an extended and overlapping period of time, enlisted the senior officers to use their positions to promote Company

5

A and help to secure government contracts, and discussed the prospect (at the very least) of the senior officers working for Company A after leaving the military.

While the government does not contend that Senior Officer 1 ordered a contract for Company A to provide workforce training, or that Senior Officer 1 ever received or accepted employment at Company A, the proffered evidence nonetheless tends to show that it was Kim and Messenger's intentional pattern and practice to use the prospect of future employment with Company A to make inroads with various branches of the U.S. military and entice military officials to advocate on Company A's behalf.  *See* Oct. 9, 2021, emails (Kim: "Maybe your next career post AF may be in nyc? We're evaluating hiring navy 4-star.") (Senior Officer 1: "Would love to work with you all.");[1] Sept. 7, 2022, emails (Kim informing Senior Officer 1 that Company A had hired Burke) (Senior Officer 1: "Great to hear about Admiral Burke...sounds like a great add to the team. What made him standout...?"); Jan. 14, 2023, email (Senior Officer 1: "I'd love to talk through some ideas I have for what I might pursue as I retire this summer (starting a new business, developing business for some small to moderate companies, leadership development / coaching…and some others)."); Jan. 18, 2023, email (Kim: "I don't know if you would be able to help schedule a meeting with the key leaders within Space Command … If we could find time over the next few weeks, Meghan and I will fly over to come see you. We could talk separately

---

[1] This exchange is also separately admissible as it is directly highly probative as to Kim's state of mind as to the underlying Burke bribery scheme.  Having reached a *quid pro quo* agreement with Burke (a job for a contract) already, Kim—like Burke—knew he had to conceal the illegal agreement from others in the military, such as Senior Officer 1.  Just as Burke's own false statements about the agreement are admissible as acts in furtherance of the conspiracy, so too is this statement designed to make Senior Officer 1 comfortable with the arrangement while simultaneously concealing the full corrupt nature of the bribery agreement with Burke.  Thus, Kim's fig leaf claim that they were "evaluating hiring" Burke when he well knew they had discussed specific compensation terms and job roles, to be obtained after Burke secured the initial contract.

afterwards."); Feb. 28, 2023, email (Messenger: "[Senior Officer 1] wants to start with 3 groups in his command of 81 people, including himself so we can get him certified. We discussed having him continue his work with us after he leaves the AirForce as one of our Leadership Coaches. The objective is for him to take the last 4 months of his time at the AirForce to help introduce us to a couple groups that can approve a 1,000 person pilot ($1 mm contract size). … More opportunities he's pursuing and the goal is for him to lead the work with the AirForce on the ground for us. So he would be a consultant helping us run AF work. He was more than excited about this conversation as we had dinner with him and [senior enlisted] last night[.]").

Many of the relevant communications involving Senior Officer 1 occurred during the charged conspiracy period (September 2020 through October 2022) involving Burke. And even though the February 2023 meeting occurred after the charged conspiracy period, if anything the timing of that meeting is even more telling than if it had occurred during the active conspiracy period. It was not until after Burke failed to deliver a second large-value Navy contract to Company A, and subsequently resigned from Company A in January 2023, that—the communications evidence shows—Kim and Messenger began openly and actively discussing Senior Officer 1 working for Company A following his retirement while using his remaining time with the military to advocate on their behalf and direct them work. Because their corrupt agreement with Burke failed to deliver the ultimate prize—a much larger government contract—Kim and Messenger (having promoted such expanded government contracting work to their investors and facing financial problems) had no choice but to try their scheme again. Moreover, the February 2023 meeting was the culmination of a years-long effort to lay the groundwork for Senior Officer 1 to help Kim and Messenger realize their ambitions to become serious government contractors. The timing was not a mere coincidence. Following Messenger's February 28, 2023,

7

email, another Company A employee replied "I love that [Senior Officer 1] can play a key role. After all these years & investments made long back … seed planted long back growing[.]" And while it is true that "[t]he temporal (as well as the logical) relationship between a defendant's later act and his earlier state of mind attenuates the relevance of such proof," Rule 404(b) "does not automatically bar evidence of a bad act that occurred subsequent to the crime charged[,]" and "later acts are most likely to show the accused's intent when they are fairly recent and in some significant way connected with prior material events." *United States v. Watson*, 894 F.2d 1345, 1349 (D.C. Cir. 1990) (quotations and citations omitted). Such is the case here.

Kim and Messenger further argue that the evidence lacks relevance because Messenger's email "did not suggest that Defendants offered Senior Officer 1 freelance work *in exchange for* introductions and a workforce training contract." ECF No. 199 at 16 (emphasis in original). Kim and Messenger's argument glosses over the fact that, as described by Messenger herself, the discussion of Senior Officer 1 "continu[ing] his work with us after he leaves the Air Force[,]" "lead[ing] the work with the Air Force on the ground for us[,]" and acting as "a consultant helping us run [Air Force] work" was inextricably intertwined with discussions of Senior Officer 1 directly awarding work to Company A ("[h]e wants to start with 3 groups in his command of 81 people") and facilitating additional military contracts for Company A ("[t]he objective is for him to take the last 4 months of his time at the Air Force to help introduce us to a couple groups that can approve 1,000 person pilot ($1mm contract size)"). Kim and Messenger's position that the proffered evidence lacks probative value—simply because they did not write something as damning as "no contract, no job"—fails.

8

### III. THE EVIDENCE IS NOT UNFAIRLY PREJUDICIAL AND WILL NOT CONFUSE THE ISSUES NOR CAUSE UNDUE DELAY.

Having established above and in the government's Rule 404(b) Notice, ECF No. 180 at 8-12, that the evidence is highly relevant to proving Kim and Messenger's state of mind in their dealings with Burke, which is likely to be a central issue in the trial, all that remains for the evidence to be admissible is whether its probative value is substantially outweighed by the danger of undue prejudice under Rule 403. In characterizing the proffered evidence as being unduly prejudicial, Kim and Messenger essentially repeat the same arguments made earlier in the Opposition for why they believe the evidence lacks probative value. *See* ECF No. 199 at 19-21. The government has already addressed those arguments above and will not repeat them here. For the reasons already discussed, the proffered evidence is highly probative of a central issue in this case—Kim and Messenger's state of mind—and the question is not whether that evidence will harm their defense in some manner, but whether the evidence's probative value "is *substantially outweighed* by a danger of one or more of the following: *unfair* prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. Abou-Khatwa*, 40 F.4th 666, 679 (D.C. Cir. 2022) (quoting Fed. R. Evid. 403) (emphasis added); *see also Cassell*, 292 F.3d at 795 ("Rule 403 tilts, as do the rules as a whole, toward the admission of evidence in close cases, even when other crimes evidence is involved." (citation and internal quotation marks omitted)); *cf. United States v. Crowder*, 141 F.3d 1202, 1210 (D.C. Cir. 1998) ("[T]he concern about 'prejudice' focused on the danger of the jury using the other crimes evidence in a way the rules do not permit—to conclude that because the defendant committed some other crime, he must have committed the one charged in the indictment. This danger, of course, will be present in every Rule 404(b) case. But that alone cannot give rise to a *per se* rule of exclusion.").

9

The potential harm to Kim and Messenger of the proffered evidence is not grounds for its suppression. To the contrary, it is axiomatic that "all evidence offered by the prosecution in a criminal case is intended to be prejudicial." *United States v. Williams*, 271 F.R.D. 1, 2 (D.D.C. 2010). Given the high evidentiary value of Kim and Messenger's conduct with Senior Officer 1 as to the charged conspiracy, and the Court's ability to alleviate any danger of undue prejudice with an appropriate instruction explaining the limited purpose of the evidence, Kim and Messenger cannot clear the high hurdle of showing that the evidence's probative value is substantially outweighed by the danger of unfair prejudice. *See Crowder*, 141 F.3d at 1210; *Long*, 328 F.3d at 662 ("[L]imiting instructions ordinarily suffice to protect the defendant's interests.").

Kim and Messenger also seek to exclude the proffered evidence on grounds that it will "likely confuse the issues" based on several "apparent similarities" between their interactions with Burke and with Senior Officer 1. ECF No. 199 at 19. Kim and Messenger's concerns about possible confusion are themselves puzzling insofar as, in arguing that the proffered evidence is of little probative value, they emphasize repeatedly in their Opposition that the two sets of conduct involve markedly different people, organizations, conduct, and time periods, and are related only at the highest level of generality. *See, e.g., id.* at 17-18. For the reasons already identified in the Opposition, a jury will easily distinguish between the conduct as to Burke and the conduct as to Senior Officer 1, again as aided by an appropriate limiting instruction—the standard means of addressing claims of confusion and prejudice for Rule 404(b) evidence.

Kim and Messenger also argue that "allowing the government to admit [the proffered evidence] will greatly expand the breadth of the trial." *Id.* at 21. Yet the evidence at issue consists of a handful of emails that could be introduced at trial through a single government witness. And to the extent that Kim and Messenger wish to cross-examine that witness in an effort to cast those

10

communications in a more favorable light, or put on a witness who can rebut what is plainly written in those emails, they are welcome to do so. Again, the government does not seek to admit those communications to prove that Kim and Messenger engaged in illegal conduct as to Senior Officer 1, but rather to establish their relevant state of mind at and around the time that they conspired with and bribed Burke.

Finally, as a last-ditch effort to exclude this evidence, Kim and Messenger argue that its admission would prohibit them from preparing a fulsome defense and would in turn violate their right to a speedy trial while they collect additional evidence. *See id.* at 21-22. To the contrary, it appears they already have all the evidence they need to attempt to paint those interactions in a different light, as demonstrated by the two-dozen exhibits attached to their Opposition.

Moreover, the fact that Kim and Messenger already possess those exhibits belies their unsupported allegations that the government somehow "sat on" this evidence, *id.* at 21, "inject[ed] [the] evidence … at the last minute," *id.*, and made a "late-breaking disclosure" of the evidence, *id.* at 22. The allegation that the government's disclosure of this evidence, or of its intent to admit the evidence at trial under Rule 404(b), was untimely is wholly divorced from reality. First, as Kim and Messenger necessarily concede, "the government complied with the disclosure deadline[.]" *Id.* at 21. And second, they neglected to note in their Opposition that the government disclosed all of its evidence concerning Senior Officer 1 at least as early as January 17, 2025— nearly six months ago. That Kim and Messenger may not have recognized the import of that evidence until now is of no consequence to its admissibility.

### IV.   CONCLUSION

For the reasons argued above and in the government's Rule 404(b) Notice, ECF No. 180, the evidence is highly probative, is offered for several permissible non-propensity purposes, and

is not unfairly prejudicial. The Court should reject Kim and Messenger's attempt to exclude appropriate, relevant evidence on the central issue in this case—their state of mind—and permit the government to admit the proffered evidence during its case-in-chief, in cross-examination during the defendants' case, or in rebuttal.

                                               Respectfully submitted,

                                               JEANINE FERRIS PERRO
                                               UNITED STATES ATTORNEY

By       /s/
            Rebecca G. Ross (NY Bar No. 5590666)
            Brian P. Kelly (DC Bar No. 983689)
            Joshua S. Rothstein (NY Bar No. 4453759)
            Assistant United States Attorneys
            601 D Street NW
            Washington, DC 20530
            Office: (202) 252-4490