UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA

v.

ROBERT P. BURKE,
YONGCHUL "CHARLIE" KIM, and
MEGHAN MESSENGER,

Defendants.

Case No. 1:24-cr-00265-TNM

**REDACTED**

### YONGCHUL "CHARLIE" KIM AND MEGHAN MESSENGER'S JOINT
### REPLY IN SUPPORT OF OMNIBUS MOTION *IN LIMINE* (ECF 176)

Defendants Yongchul "Charlie" Kim and Meghan Messenger (together, "Movants") respectfully submit this reply in further support of their omnibus motion *in limine*. For the reasons stated in their motion and below, the motion should be granted in its entirety. Movants further request oral argument on the motion at the pretrial conference currently schedule for July 25, 2025.

I.    **THE COURT SHOULD LIMIT WHAT TESTIMONY THE GOVERNMENT MAY ELICIT FROM ITS SUMMARY/OVERVIEW AGENT WITNESS(ES).**

As explained in Movants' motion *in limine*, the Court should preclude the government from eliciting several categories of impermissible testimony from any law enforcement agent it may call. *See* ECF No. 176 at 3-14. Specifically, the Court should preclude the government from eliciting agent testimony that (i) summarizes evidence that is neither voluminous nor admissible, (ii) is based on hearsay, and/or (iii) reflects what other factfinders determined about the evidence, including magistrate judges. *Id.* In short, Movants seek to preclude thee unobjected to summary and hearsay evidence that the government elicited through FBI Special Agent Sebastian Gardner at the trial of Adm. Burke. Such "overview testimony" may be permissible when the government presents an indictment to the grand jury for a probable cause assessment, but it is wholly

inappropriate and inadmissible where, as here, the government must prove facts beyond a reasonable doubt to a petit jury at trial—and is bound by the Federal Rules of Evidence.[1]  *Id.*

The government's proposed misuse of an "overview witness" has been condemned by courts in this Circuit and elsewhere when objected to by defense counsel, including in decisions cited in the government's own opposition brief.  *See* ECF No. 201 at 3 (citing and quoting, among others, *United States v. Moore*, 651 F.3d 30 (D.C. Cir. 2011)).  In *Moore*, the D.C. Circuit joined other circuits in "condemning the practice," in part because "the use of non-expert summarization evidence . . . . offers [the prosecution] an opportunity to 'poison the jury's mind against the defendant or to recite items of highly questionable evidence.'"  *Id.* at 60 (quoting *United States v. Thomas*, 114 F.3d 228, 248 (D.C. Cir. 1997)).  As noted in *Moore*, because such testimony is not rooted in personal knowledge as required by Rule 602, the D.C. Circuit and others "have viewed agents' hearsay-laden or hearsay-based overview testimony at the onset of trial as a rather blatant prosecutorial attempt to circumvent hearsay rules."  *Id.* at 57−60 (quoting *United States v. Smith*, 640 F.3d 358, 367 (D.C. Cir. 2011) (following First, Second, and Fifth Circuits) (citations omitted); *see also United States v. Flores-De-Jesus*, 569 F.3d 8, 16−17 (1st Cir. 2009) (condemning use of overview witnesses and noting that "we have repeatedly been forced to chide the government for its continued improper use of overview witnesses despite our admonitions about this practice").

---

[1]  Because Adm. Burke's counsel did **not** object to this type of summary and hearsay testimony by Special Agent Gardner, this Court has not had the opportunity to address this issue. Based on a review of that testimony, it is apparent that Adm. Burke's counsel made a reasoned and strategic decision not to object.  Should the Court grant this motion, in whole or in part, it should not and would not have an impact on the conviction of Adm. Burke given that Adm. Burke was represented by excellent counsel who made reasoned and strategic decisions in the best interests of Adm. Burke at trial.

Whether cast as an overview witness or a summary witness, the government's unfettered use of agent testimony would impermissibly grant the government the equivalent of a second opening statement or closing argument, place the imprimatur of the FBI on *contested issues of material facts* at trial, enable the government agent to interpret communications without any personal knowledge of what they mean and based on hearsay in light of the government's one-sided view of the evidence, and improperly color the jury's view of expected evidence and testimony. The government's attempts to defend its use of an agent to provide summary/overview testimony only show why the Court should grant Movants' motion, not deny it.

### A.    The Government Should Be Precluded from Eliciting the Proffered Testimony about the Background of the Investigation.

The government is incorrect that it should be permitted to call an agent to provide summary/overview testimony about (a) the breadth and completeness of the government's investigation, (b) investigative techniques "that a lay person may not understand," and (c) the fact "that the government lawfully obtained evidence pursuant to court order or search warrant [including, a] . . . magistrate's duty to find probable cause to issue a warrant during an ongoing investigation . . . ." ECF No. 201 at 5−6.

Although courts have allowed a summary/overview agent to provide "relevant background" about an investigation, such as how it "was initiated, what law enforcement entities were involved, and what investigative techniques were used," *see Moore*, 651 F.3d at 60, courts have *rejected* summary/overview testimony aimed at unfairly bolstering the investigation or evidence gathered pursuant to it—such as testimony about approvals for warrants. *See, e.g.*, *United States v. Cunningham*, 462 F.3d 708, 713, 715 (7th Cir. 2006) (reversing conviction where trial court allowed government to offer testimony about application process for a wiretap: "The government witness was improperly vouching for how good the evidence was."); *United States v.*

*Brown*, 692 F.2d 345, 350 (5th Cir. 1982) (finding it was "clearly error" for the district court to admit the wiretap authorization into evidence as foundation evidence and explaining that "the content of the order was neither relevant nor probative to the jury's task of evaluating the actual wire-tap conversations"); *People v. Okundaye*, 545 N.E.2d 505, 513 (Ill. App. Ct. 1989) (reversing criminal conviction because "the highly prejudicial and irrelevant evidence of the facts and circumstances surrounding the acquisition of probable cause and the issuance of the search warrant was clearly inadmissible").

This Court should likewise prevent the government from unfairly bolstering its investigation and evidence through the testimony of a summary/overview witness about the completeness of the investigation, the investigative techniques employed, and the fact that a magistrate judge found probable cause for a search warrant. Such testimony is irrelevant to Movants' guilt or innocence and would serve only to unfairly prejudice the jury. *See Cunningham*, 462 F.3d at 712−13 ("The procedures used and the opinions obtained in gaining authority for use of the wiretaps were wholly unrelated to the defendants' guilt or innocence—and not necessary to be established to prove the case against the defendants. . . . . In short, the government piled on needless, unfairly prejudicial evidence that may have affected the jury's judgment, and this error was not harmless.").

Finally, the government is wrong that it may elicit from a summary/overview agent witness testimony about "why the government investigation focused on a certain date range." ECF No. 201 at 5. Specifically, the government argues that it should be able to elicit testimony similar to the unobjected to testimony it elicited at the trial of Adm. Burke, where Special Agent Gardner stated that the investigation focused on a certain period because that is when "the alleged contract and job offer kind of swap occurred." ECF No. 176 at 4. Such testimony is improper (where the

defense objects) because it would impermissibly place the imprimatur of a federal agent on disputed allegations. Indeed, testimony from Special Agent Gardner would carry the imprimatur of not only the federal government but also its chief investigative agency. *See Moore*, 651 F.3d at 60. As to contested trial issues, such as the existence of the alleged *quid pro quo*, this testimony may improperly sway the jury to resolve the disputes in favor of the government because the agent has purportedly examined and resolved any debate. *See Moore*, 651 F.3d at 60; *Flores-De-Jesus*, 569 F.3d at 17−19 (describing the "inescapable" "imprimatur problem," including how an agent's overview testimony serves as "an endorsement of the veracity of the testimony that will follow"). The testimony must therefore be excluded because it would threaten to usurp the role of the jury.

### B.    The Government Should Be Precluded from Eliciting the Proffered Testimony about Individuals and Entities Associated with the Investigation.

The government is wrong in arguing that it should be able to elicit testimony from a law enforcement agent regarding "1) Company A, Kim and Messenger, and their roles in the contracting process; 2) Admiral Burke and his role in contracting with Company A; 3) Person 3, her relationship with Burke, and her connection to events relevant to the investigation; and 4) senders and recipients of emails sent and received during the investigation." ECF No. 201 at 6. According to the government, such testimony is admissible because it is "based on personal knowledge," *i.e.* the knowledge gathered by the "summary witness [who] spent years investigating a case, including reviewing government databases, business records, locating and reviewing public records, and surveilling individuals." *Id.* at 6−7. This argument must be rejected because it would effectively eliminate both the personal knowledge requirement of Rule 602 and the prohibition against hearsay in Rule 802. If an agent could testify from purported "personal knowledge" based on facts gathered during an investigation, the government would never have to call any non-law

enforcement witnesses.  By definition, although not objected to by Adm. Burke's counsel for strategic reasons, that testimony is hearsay.

Under Rule 602, admissible evidence is limited to matters of which a witness has acquired personal knowledge through any of his own senses.  *See* Fed. R. Evid. 602 & Advisory Committee Note to 1972 Proposed Rules.  A witness cannot, however, gain personal knowledge of matters based on a review of hearsay statements about them, because hearsay statements are generally inadmissible under Rule 802.  *See United States v. Davis*, 596 F.3d 852, 856 (D.C. Cir. 2010) (excluding witness testimony about underlying facts that was based on hearsay).  As the court in *Davis* noted, "'[i]f the testimony on its face purports to be based on direct perception of the facts described but is actually based on an out-of-court statement about those facts, the objection should be lack of personal knowledge.'"  *Id.* (quoting 27 C. Wright & V. Gold, Fed. Prac. & Proc. Evid. § 6022 (2d ed. 2007)).  Any other rule would allow parties to avoid the rule against hearsay "simply by restating the facts contained in the hearsay statement" as though the witness has personal knowledge of them.  27 C. Wright & V. Gold, Fed. Prac. & Proc. Evid. § 6022.

Here, the government's summary/overview witness, Special Agent Gardner, has no first-hand, personal knowledge of Company A, Movants, their roles in the contracting process; Adm. Burke and his role in contracting with Company A; Person 3, her relationship with Burke, and her connection to events relevant to the investigation; and/or senders and recipients of emails sent and received during the investigation.  Rather, by the government's own admission, Special Agent Gardner would be testifying about information that he has gathered from his (one-sided) review of hearsay, such as government databases and other records he collected during the investigation.  Such testimony is therefore inadmissible and must be excluded.

As Movants explained in their motion *in limine*, Special Agent Gardner testified about myriad matters in Adm. Burke's trial that he would have only known about from second-hand sources—documents (written out-of-court statements) or witness interviews (oral out-of-court statements)—such as the structure of Company A's business (ECF No. 176 at 5), the occurrence of certain meetings (*id.* at 6), Adm. Burke's affair with Person 3 (*id.* at 8), and the identities of email senders and recipients (*id.* at 11−12).  Given Movants' respective objections to this testimony (in contrast to Adm. Burke's reasoned decision to not object), the government must not be permitted to do so again.  If the government wants to put these facts into evidence, it must call a competent witness with relevant firsthand knowledge, not have an agent repeat hearsay.  Among other issues, a contrary rule would preclude Movants from effective cross-examination.

To be sure, Special Agent Gardner may testify about specific events he witnessed while conducting surveillance, but that is not the type of testimony the government seeks to elicit.  Here, the government seeks to elicit from Special Agent Gardner testimony about organizations, relationships, interactions, and processes that he was not part of and that he only knows about from the statements of other witnesses and documents.  Because Special Agent Gardner (or any other law enforcement agent called by the government) lacks personal knowledge regarding the subjects identified in Movants' *in limine*, the motion must be granted in its entirety on this issue.

### C.    The Government Should Be Precluded from Eliciting the Proffered Testimony about What Evidence Was Collected and Not Collected During the Government's Investigation.

The government is incorrect that it may elicit from a summary/overview agent "testimony relating to Company A's contracts, training, legal, and paperwork requirements, and email obtained during the investigation," because this testimony "is all based on evidence the government intends to admit at trial or that would otherwise be admissible."  ECF No. 201 at 8. Such summary/overview testimony runs directly counter to controlling law in this Circuit.

As discussed above, the D.C. Circuit has explicitly "condemn[ed] the practice" of having "witness[es] present[] an overview of the government's case-in-chief" because it "runs the serious risk of permitting the government to impermissibly 'paint a picture of guilt *before the evidence has been introduced' . . . and may never be introduced*." *Moore*, 651 F.3d at 60 (quoting *United States v. Griffin*, 324 F.3d 330, 349 (5th Cir. 2003)) (emphasis added); *Griffin*, 324 F.3d at 349 (noting that, because "the evidence had not yet been presented," the witness "was testifying more as an 'overview witness' than a summary witness" and that "[a]llowing [tendentious] testimony would greatly increase the danger that a jury 'might rely upon the alleged facts in the [overview] as if [those] facts had already been proved,' or might use the overview 'as a substitute for assessing the credibility of witnesses' that have not yet testified." (citation omitted)).  The government already has an opportunity to give the jury an overview of its case: the opening statement.  *See Moore*, 651 F.3d at 57 (citing *United States v. Garcia*, 413 F.3d 201, 214 (2d Cir. 2005)).  Any probative value of a second overview from an FBI agent is far outweighed by unfair prejudice to Movants.

In Adm. Burke's trial, without objection from Adm. Burke's counsel, Special Agent Gardner testified about a variety of matters that, at the time he testified about them, were not yet admitted into evidence.  For instance, Agent Gardner described Company A's ecommerce business (ECF No. 172 at 99:17−20), the identities of email senders and recipients (*see, e.g.*, ECF No. 172 at 101:23; ECF No. 185 at 10:23, 11:2, 12:25, 13:3, 34:11−12), the occurrence of certain events (*see, e.g.*, ECF No. 173 at 67:1−2), the nature of the relationship between Person 3 and Adm. Burke (ECF No. 185 at 57:17−19), and Adm. Burke's performance at Company A (ECF No. 173 at 113:7−12).  The government must be prevented from doing so again.

To be sure, the government may have Special Agent Gardner (or any other law enforcement witness) read to the jury documents that have already been admitted into evidence, but the government cannot be allowed to have such a witness interpret those documents or make inferences from them. *See United States v. Cooper*, 949 F.3d 744, 750 (D.C. Cir. 2020) (noting that a summary witness "may not usurp the jury's fact-finding function by summarizing or describing not only what is in evidence but also what inferences should be drawn from that evidence."). Thus, the government must be prohibited from eliciting testimony from any law enforcement witness about the proper interpretation documents and information. *See United States v. Safavian*, 435 F. Supp. 2d 36, 42 (D.D.C. 2006) ("The jury may draw whatever reasonable conclusions and inferences it chooses to from these e-mails and determine how to consider them, but the Court will not permit any testimony beyond the bare fact of what words appear on a particular e-mail by a case agent or summary witness who neither composed nor received these e-mails."). The government did this repeatedly in the trial of Adm. Burke; it must be prevented from doing so again.[2]

---

[2] *See, e.g.*, Mot. at 7, 12−13; ECF No. 185 at 33:23-34:4 ("We see here that the Defendant mentioned a legal review. If you know, what is that referring for [sic]?"), 41:13 ("[W]ho is that 'him' referring to?"), 42:10 ("You see that he wrote: Will make happen. What is that referring to?"), 45:17 ("Juliet: Who is that a reference to?"), 47:9−10 ("Robert Thomas references a time-honored tradition. What is he referring, to, Agent Gardner?"), 47:17 ("[W]hat event is he referring to?"); 51:15−18 ("Q. Is it for a separate room? A. It is. Q. How do you know? A. It's a different confirmation number."), 69:8−9 ("[W]e see that the Defendant referenced four people. If you know, who were those four people?"), 81:14−15 ("In other words, is that the increased contract that Kim referenced earlier in this email?"), 87:24−25 ("And when he said, 'I've essentially agreed to work for them,' who is he referring to?"), 95:11−12 ("[W]hat is the reference to the Aussies here?"), 95:14−15 ("What is he talking about or referencing here, if you know?"), 102:24−103:2 ("[W]hat was the goal of getting those demonstrable metrics?"), 104:7−9 ("[W]hat was your understanding of Phase 1 of Defendant's engagement with Kim and Messenger?"), 104:14−15 ("[W]hat is your understanding of what Phase 2 was there?"), 107:12−16 ("Q. . . . . [H]ave you reviewed that glossary for the meaning of TP? A. Yes. Q. And what does that mean? A. Training partner."), 109:21−22 ("[W]hat is your understanding of the purpose of this?"), 113:23−24 ("What was kind of the goal of the thing that it triggers? What is that referring to?"), 114:8 ("[W]hat is

Finally, the government is incorrect in arguing that it may elicit from a summary/overview witness testimony about what did *not* happen, based on evidence that was not found during the investigation. *See* ECF No. 201 at 8. Again, such testimony would violate the personal knowledge requirement of Rule 602.

## II.    THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT THAT COMPANY A'S PRODUCTS WERE NOT WELL RECEIVED OR, IN THE ALTERNATIVE, ADMIT EVIDENCE THAT THEY WERE.

As explained in Movants' motion *in limine*, evidence that Company A's products and services were of poor quality—or received a negative reaction from certain Navy personnel—has no or little bearing on whether Movants engaged in an illegal *quid pro quo* or the charged conspiracy. *See* ECF No. 176 at 15–19. The Court should therefore exclude this evidence because of its nonexistent to limited probative value and because it would unfairly prejudice Movants by leading the jury to a decide the case on an "improper basis." *United States v. Ring*, 706 F.3d 460, 472 (D.C. Cir. 2013) (quoting Fed. R. Evid. 403 Advisory Committee's Notes). If the Court permits the government to introduce this unfairly prejudicial evidence, then it should also permit Movants to introduce the Navy's positive reviews of Company A (and the fact that Company A's products were valuable).

### A.    Evidence Regarding the Quality of Company A's Products Is Irrelevant.

---

FedRAMP?"); ECF No. 173 at 15:1 ("Who were those seniormost people?"), 15:6 ("What is that short for?"), 16:3−4 ("[W]hat does 'contract vehicle company' mean in this context?"), 17:17 ("[W]hat does [OMM] refer to, Agent Gardner?"), 23:24−25 ("Based on your review of this exhibit, what did you conclude it to be?"), 24:21−22 ("[W]hat does this appear to be?"), 42:21−22 ("[W]hy did this contract between [Company A] and the Navy have to be fast tracked?"), 51:2−5 ("[B]ased on your understanding of the three phases of the plan that we saw in the email that Charlie Kim sent out, where does this fall?"), 59:11−12 ("Q. And for the draft business case, what was it for? A. Effectively, a pilot with [Company A] and the Royal Navy."), 66:21 ("[W]ho is the Barbara referring to here, Agent Gardner?"), 66:23−24 ("[B]ased on your investigation, what trip is Charlie Kim referring to here?"), 20:25−21:1 ("Was the defendant required to report job negotiations?"), 84:6−7 ("What does it mean that he was disqualified, Agent Gardner?").

As Movants noted in their motion, ECF No. 176 at 16, and as the government agrees in its opposition, ECF No. 201 at 9, this case does not revolve around the quality of services provided. Instead, this case revolves around Movants' actions and their states of mind at the time. Any attempt to prove the alleged bribery or conspiracy through the quality of services rendered is speculative. Whether Company A's services ended up being well or poorly received is not evidence of an illegal *quid pro quo* to deliver those services. *See United States v. McDonough*, 727 F.3d 143, 161 (1st Cir. 2013) ("The issue in this case is not whether the defendants truly thought the software was a benefit to the Commonwealth; instead it is whether they intended to exchange payments to [the government official] for assistance to [defendants' company].").

In its opposition, the government argues that it should be permitted to admit evidence that Company A's products were substandard to show (i) Adm. Burke's state of mind, and (ii) Movants' state of mind. *See* ECF No. 201 at 10–11. But any relevance that the quality of Company A's services might have to Adm. Burke's state of mind, knowledge, or motive is beside the point for Movants' trial. The issue here is Movants' intent, not what motivated Adm. Burke. And, with regard to Movants' state of mind, the evidence is likewise irrelevant. The documents cited in the government's opposition about issues with Company A's products comes in the context of feedback regarding how to move forward with a potential contract, not complaints that Company A's products were so substandard that the contract could never happen. For example, the September 2021 email where Burke states that ███████████████████████████ ███ concludes by stating: ███████████████████████████ ███████████████████████████ Ex. A. Finally, reviews by Navy personnel of Company A's trainings in Naples, Italy, and Rota, Spain in January 2022 have no bearing on whether—as

the government alleges—Movants and Adm. Burke entered into an illegal *quid pro quo* months prior.

**B.    Evidence Regarding the Quality of Company A's Products Is Unfairly Prejudicial, Misleading, and Confusing.**

Any slight relevance that evidence regarding the quality of Company A's products may have is greatly outweighed by the danger of unfair prejudice, confusion, and misleading the jury. It should accordingly be excluded under Fed. R. Evid. 403.

First, admitting the evidence would invite the jury to decide the case based on the quality of the services provided—in effect, whether the U.S. Navy got its money's worth—which is entirely irrelevant to whether there was an unlawful *quid pro quo*.  By framing Movants as having bilked the U.S. Navy of public funds, the government will encourage the jury to see Movants as swindlers and not co-CEOs of a legitimate, successful business.  Furthermore, unlike Adm. Burke, Movants are co-CEOs of Company A; thus, negative reviews of Company A will have a far more prejudicial effect on them than on Adm. Burke.  Regardless of their bearing on intent or motive, these negative reviews of Company A are "unfairly prejudicial" because "[they] prejudice[] [Movants'] case 'for reasons other than its probative value.'"  *United States v. Wilkins*, 538 F. Supp. 3d 49, 70 (D.D.C. 2021) (quoting *United States v. Wallace*, 124 F. App'x 165, 167 (4th Cir. 2005)).

In addition to unfair prejudice, the risk of jury confusion is particularly pronounced.  The parties agree: "whether or not Company A's products were objectively 'good,' or may have in fact benefited the Navy . . . is not at issue here."  ECF No. 201 at 15.  Thus, admitting Navy personnel's opinions about Company A's products and services—particularly those that Movants knew nothing about—would threaten to confuse the issues without any appreciable probative value regarding Movants' state of mind.  In other words, evidence about the quality of Company A's

trainings and software is collateral to this case and introducing such evidence would confuse the jury about the core issues it must decide.  It should therefore be excluded.  *See United States v. Condon*, 720 F.3d 748, 755 (8th Cir. 2013) ("Confusion of the issues warrants exclusion of relevant evidence if admission of the evidence would lead to litigation of collateral issues.").

**C.    If the Court Allows the Government to Admit Evidence that Company A's Products Were Not Well Received, then the Court Must Allow Movants to Introduce Evidence that the Products Were Well Received.**

The government's position that it may introduce evidence that Company A's products were not well received, while Movants can only rebut such evidence through narrow cross examination, must be rejected.  *See* ECF No. 201 at 15–16.  This argument ignores the fundamental rule that "[a] criminal defendant has a constitutional right to present evidence in his own defense." *Wilkins*, 538 F. Supp. 3d at 64.  "Particularly when the evidence is central to the defendant's claim of innocence," the "categorical exclusion" of the defendant's evidence "'infringe[s] upon a weighty interest of the accused,' and threatens 'the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing.'" *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012), *as amended* (Sept. 28, 2012) (citations omitted).

The government theory is that the poor quality of Company A's training provided an incentive for Movants resort to bribery to secure a Navy contract.  ECF No. 201 at 11.  Movants' theory is that Adm. Burke and other Navy officials genuinely believed in Company A's value proposition and awarded the January 2022 training contract accordingly.  This theory is supported by expected testimony from Navy personnel, Navy survey results on the effectiveness of Company A's trainings, and emails amongst Navy officials showing appreciation for Company A.  For example, positive reviews by Navy personnel who attended Company A's leadership academy in December 2021 provide an alternate reason for why the Navy awarded Company A the January 2022 training contract.  Additionally, while enlisted personnel may have had some negative

reviews of Company A's January 2022 training, some officers appeared to find value in that same training.  These positive reviews of Company A's services, which are extensive, Exs. B, C, D, rebut the government's evidence of motive and support Movants' theory of the case.  Such evidence should be admitted, particularly if the Court allows the government to admit evidence of Company A's allegedly substandard products.  *See United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 145 (D.D.C. 2012) ("[M]otive is always relevant in a criminal case, even if it is not an element of the crime." (citation omitted)).  Indeed, the positive reviews provide an alternative and innocent explanation for Movants' and Adm. Burke's conduct.  *United States v. Law*, 528 F.3d 888, 896 (D.C. Cir. 2008) ("But when faced with an innocent explanation sufficiently supported by the evidence to create a reasonable doubt about the defendant's guilt, the Government's burden is to present evidence sufficient to dispel that doubt.").

Finally, fundamental fairness dictates that, if the government is allowed to introduce negative evidence of Company A's products and services in its case-in-chief, then Movants must be permitted to offer evidence of the opposite.  *See* ECF No. 201 at 15–16.  To hold otherwise would not only give the jury an inaccurate impression of the facts, but would arbitrarily infringe on Movants' constitutional right to present evidence in their own defense.  *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *United States v. Lathern*, 488 F.3d 1043, 1046 (D.C. Cir. 2007) (Kavanaugh, J.).

## III. THE COURT SHOULD EXCLUDE EVIDENCE AND ARGUMENT THAT COMPANY A WAS A NEGATIVE WORKPLACE, AS WELL AS OTHER IRRELEVANT AND UNDULY PREJUDICIAL NEGATIVE OPINIONS OF MOVANTS.

The government concedes that it does not intend to introduce evidence that Company A had a negative workplace atmosphere, that its employees harbored negative opinions of Movants, or other similar evidence to impugn Movants' character or to cast Company A as negative work

environment.  ECF No. 201 at 16–17.  The Court should accordingly grant Movants' motion *in limine* on this issue as unopposed.

## IV.    THE COURT SHOULD EXCLUDE TESTIMONY FROM PERSON 3 CONCERNING HER PRIVATE CONVERSATIONS WITH ADM. BURKE.

As explained in the motion *in limine*, the Court should preclude the government from eliciting testimony from Person 3 concerning an alleged private, animated conversation she purportedly had with Adm. Burke following the July 2021 lunch meeting between Person 3, Adm. Burke, and Movants.  Such testimony offers no insight as to what Movants believed at the time.  Movants were not present for the alleged private, post-lunch conversation between Person 3 and Adm. Burke, and there is no evidence to suggest that they knew, or had reason to believe, it would take place.  Nor is there evidence Movants learned of it afterwards.  Additionally, Person 3's observations about Adm. Burke's reactions and/or demeanor cannot possibly be used to establish Movants' criminal intent.  For these reasons, Person 3's testimony about the conversation should be excluded for its tendency to confuse the jury and to invite the jury to draw inferences about Movants' criminal intent based on evidence that does not bear upon it.  *See* ECF No. 176 at 20.

The government is incorrect in arguing that such testimony is admissible because it tends to demonstrate the existence of the conspiracy and Adm. Burke's knowledge of, participation in, and efforts to conceal it.  *See* ECF No. 201 at 17.  As a preliminary matter, a purported non-conspirator's lay opinion on the appropriateness of the July 23, 2021 lunch conversation does not speak to the existence of the charged conspiracy (or a co-conspirator's recognition thereof).  Moreover, the fact that Person 3 was present for—and felt comfortable opining on—that conversation suggests that the relationship between Adm. Burke and Movants lacked a "concealment aspect."  *Id.*  If Adm. Burke intended to conceal the existence of the alleged conspiracy, he could have chosen not to invite Person 3 to a lunch during which its existence would

be discussed.   Person 3's ███████████████████████████████████████████

███████  Person 3, and told her ██████████████████████████████████████

███████—does not speak to the existence of a conspiracy any more than testimony that he

remained calm suggests the opposite.  Ex. E at 39.  At bottom, Person 3's statement to Adm. Burke

that ██████████████████████████████ is an out-of-court statement offered for its

truth, meaning it is inadmissible.

    Person 3's ██████████████████████████████████████

██████ fares no better.  The government claims that this statement is *not* being offered for its truth

(*i.e.*, that the conversation "was, in fact, inappropriate"), but rather to establish that Adm. Burke

*believed* that the conversation was inappropriate.  ECF No. 201 at 19.  That assertion is irrelevant.

Adm. Burke's personal thoughts about the conversation are not probative of Movants' state of

mind.  And, to state the obvious, Person 3's statement and Adm. Burke's reaction reveal nothing

about the existence of a conspiracy any more than the fact that Movants and Adm. Burke shared a

meal does.  The government seeks to elicit this testimony to prove that the conversation was

*actually* inappropriate.  For that reason, the statement should be excluded.

    The same is true for Adm. Burke's alleged statement that ████████████████████

████████████████████████████.  Ex. E at 39.  The government cannot credibly

explain how Adm. Burke's views reflect Movants' views or how this statement was "in furtherance

of the conspiracy."   Fed. R. Evid. 801(d)(2)(E).  The success of the alleged conspiracy was not

contingent upon Movants' feelings.  And had Adm. Burke truly intended to prevent Person 3 from

alerting law enforcement, the easiest way to do so would have been to simply tell her to keep quiet,

not to tell her she was rude.  The statement is offered for its truth (to prove not just that Adm.

Burke believed the conversation was wrong, but that the conversation actually was wrong), does

not tend to make any fact of consequence more or less probable, is highly prejudicial for the reasons described above, and is, for the foregoing reasons, inadmissible.

## V.    THE COURT SHOULD EXCLUDE EVIDENCE CONCERNING PERSON 3's GOVERNMENT-ISSUED SECURITY CLEARANCE.

The government concedes that it does not intend to introduce evidence of Person 3's security clearance. ECF No. 201 at 19–20. The Court should accordingly grant Movants' motion *in limine* on this issue as unopposed.

## VI.    THE COURT SHOULD PERMIT MOVANTS TO EXAMINE SPECIAL AGENT DELAPENA ON HIS PRIOR CONDUCT.

The government seeks to preclude Movants from examining Special Agent DeLaPena regarding prior allegations of misconduct because, according to the government, there is no credible evidence that Special Agent DeLaPena's conduct was willful. ECF No. 201 at 20-25. But the government ignores the *Newland* court's finding that Special Agent DeLaPena provided "false testimony regarding the origin" of hard drives that were collected in that case. ECF No. 176 at 24. Even under the government's myopic view of what conduct is appropriate for examination, this conduct is fair game and Movants should be allowed to examine Special Agent DeLaPena on it.

As to the other allegations, the government does not dispute, nor could they, that Special Agent DeLaPena swore out an affidavit that contained inaccurate information, and Movants are not aware of any circumstances under which such conduct would be proper. At a minimum, it indicates sloppy work, if not misconduct, and Movants are permitted to probe the lead case agent's history of investigative shortcomings even if they are not willful. Indeed, the government concedes that Special Agent DeLaPena did, in fact, discuss paying potential witnesses prior to trial in *Newland*. This conduct—like Special Agent DeLaPena's false testimony regarding the hard

drives—happened in a case nearly identical to this one, and, if nothing else, undercuts the accuracy and reliability of Special Agent DeLaPena's testimony here, and more generally the reliability and completeness of the investigation that he led. The conduct is ripe for examination. The Court in *Newland* shared this view, stating:

> [T]he *underlying facts surrounding the false allegations in the Rafaraci complaint constitute Brady material because they are relevant to the reliability of Agent DeLaPena, the case agent in both cases*. . . . [T]here is no objective test for determining what is a good faith mistake and what is careless or reckless error, or even worse. The documents reflect at least two allegations set forth in a sworn complaint by Agent DeLaPena were incorrect and should have been detected at the time of the complaint . . . *While these mistakes certainly could have been satisfactorily explained by Agent DeLaPena, they do tend to cast doubt on his accuracy and reliability – a legitimate avenue for impeachment* . . . .

ECF No. 202-1 at 2-3 (emphasis added).

Further, Movants should be permitted to introduce extrinsic evidence during its examination of Special Agent DeLaPena to show his bias. *See United States v. Smith*, 232 F.3d 236, 242-43 (D.C. Cir. 2000). As stated above—and in the government's opposition—the conduct in question occurred during investigations very similar to this one—a point which the government conveniently ignores and that is relevant to bias. The fact that Special Agent DeLaPena engaged in improper conduct in two prior, similar criminal cases suggests that he is biased in favor of the government and willing to engage in improper conduct to secure a conviction in this case. Movants should be permitted to explore Special Agent DeLaPena's conduct not only through questioning, but through extrinsic evidence as well.

The fact that the affidavit in question was redacted, or that a DoD-OIG-OPR report concluded that Special Agent DeLaPena did not engage in misconduct is not dispositive. Neither disproves the allegations that Special Agent DeLaPena engaged in misconduct.

Finally, the government's arguments that these lines of examination are prejudicial because they suggest Special Agent DeLaPena "lied under oath" or "generate an inference that [he] is not a truthful witness" miss the mark. ECF No. 201 at 23. As to his testimony concerning the hard drives in *Newland*, the government need not worry that the jury may be left with the impression that Special Agent DeLaPena lied under oath because he actually *did* lie under oath; that was the court's finding. And any potential prejudice associated with the other lines of examination may be appropriately addressed during the government's redirect examination. Put simply, evidence that Special Agent DeLaPena is not a diligent investigator, or even lied in other investigations, is directly relevant to the jury's assessment of the investigation that he led as to Movants.

Respectfully submitted,

DATED July 11, 2025

*/s/ William A. Burck*
William A. Burck

Reed Brodsky (*pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Ave.
New York, New York 10166
Tel: (212) 351-5334
rbrodsky@gibsondunn.com

Rocco F. D'Agostino
(Bar No. NY0592)
445 Hamilton Ave., Suite 605
White Plains, NY 10601
Tel: (914) 682-1993
Rdagost463@aol.com

*Counsel for Defendant Meghan Messenger*

William A. Burck (DC Bar No.: 979677)
Avi Perry (DC Bar No.: 90023480)
John (Fritz) Scanlon (DC Bar No.: 983169)
Rachel G. Frank (DC Bar No.: 1659649)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
1300 I Street NW, Suite 900
Washington, D.C. 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
williamburck@quinnemanuel.com
aviperry@quinnemanuel.com
fritzscanlon@quinnemanuel.com
rachelfrank@quinnemanuel.com

Christopher Clore (*pro hac vice*)
QUINN EMANUEL URQUHART & SULLIVAN, LLP
295 5th Ave.
New York, NY 10016
Tel: (212) 849-7000
Fax: (212) 849-8100
christopherclore@quinnemanuel.com

*Counsel for Defendant Yongchul "Charlie" Kim*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, a copy of the foregoing Reply was electronically filed with the Clerk of the U.S. District Court for the District of Columbia via CM/ECF and served to all counsel of record via electronic mail.

/s/ *William A. Burck*
William A. Burck (DC Bar No.: 979677)

Dated: July 11, 2025