**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. 24-CR-265 (2)(3) (TNM)** |
| v. | : | |
| | : | |
| **YONGCHUL "CHARLIE" KIM, and** | : | |
| **MEGHAN MESSENGER,** | : | |
| | : | |
| **Defendants.** | : | |

## UNITED STATES' SUPPLEMENTAL TRIAL BRIEF

In April 2021, Defendants Yongchul "Charlie" Kim ("Kim") and Meghan Messenger ("Messenger") were at a tipping point—they were desperate for a revenue-producing contract for Company A's leadership training business to appease frustrated investors.    Co-defendant Robert Burke ("Burke") was also at a tipping point.    He was ready to retire from the United States Navy. He told a colleague that he was "out of gas" and "looking at the earliest [he] can go."    To solve their respective problems, the Defendants came to an illicit, corrupt agreement.    They agreed that Burke would use his position as a four-star Admiral in the United States Navy to order his subordinates to give a contract to Company A and, subsequently, to influence other high-ranking Navy officials to give another, more valuable contract to Company A.    In exchange, Kim and Messenger promised to and did employ Burke as a Senior Partner at Company A at an annual salary of $500,000 plus stock options—which Company A claimed could be worth millions—and other benefits.    Because Burke knew that this *quid pro quo* was illegal, Burke concealed material information from the Navy about the nature of his relationship and discussions with Kim and Messenger.    Because they also knew that this *quid pro quo* was illegal, Kim and Messenger also concealed the full scope of their agreement with Burke from their investors, staff, and family.

Only amongst each other, was the true nature and conditions of their illicit and corrupt agreement known and understood, as Meghan Messenger put it: "no contract no job."

On August 18, Kim and Messenger will stand trial for their roles in this bribery scheme.[1] The Government is ready for trial.

This memorandum describes how the Defendants' bribery scheme worked and the legal issues that the Government anticipates may arise at trial.

### FACTUAL BACKGROUND[2]

**A. The Defendants' Bribery Scheme**

*1. Company A Seeks Government Contracts*

In or about August 2018, Company A was subcontracted with the Navy to provide workforce training to the Office of the Chief of Naval Personnel, which was then under Burke's command.  Under the contract, Company A had the potential to obtain as much as $10 million from a pilot program, and Kim believed the pilot program could ripen to a $100 million contract. But the pilot program was poorly received, and the Navy terminated it after roughly a year. In the end, Company A received a mere fraction of the revenue they had hoped to obtain.   Government Exhibit ("GOVEX") 13.

By November 2019, Kim and Messenger tried to reestablish business with the Navy and went to Burke directly to pitch their proposal.  But Burke had already transitioned to another

---

[1] After a jury trial that began on May 6, Burke was found guilty of all four charges related to his role in this bribery scheme and the subsequent coverup.

[2] The Government's Trial Brief set forth a similar description of the scheme as it related to Defendant Burke, as well as Defendants Kim and Messenger.  ECF 155.  The Government Exhibits cited in that fact section related to Defendant Burke's trial, but the Government Exhibit citations in this brief are specific to the August 18, 2025, trial of Defendants Kim and Messenger.

position in the Navy, and they were instructed by a Navy officer to have no further contact with him. GOVEX 11. Kim and Messenger confirmed that they understood the message, telling Burke that they would "stand by until we hear from you." *Id.*

Yet not long after losing the coveted Navy contract, Company A came under financial strain from the economic disruptions of the COVID-19 pandemic. Messenger wrote to an investor in July 2020, for example, that "we are experiencing a 50% drop in weekly revenues." GOVEX 23. This decline related to Company A's e-commerce business line ("Business-1") because its other business line, workforce and leadership development training ("Business-2"), had reported zero revenue since the Navy pilot program ended in late 2019. GOVEX 58. The precipitous loss of revenue for Business-1 and the lack of other prospects for Business-2 formed a clear motive for Kim and Messenger to enter into the corrupt agreement with Burke—they needed the money, needed to prove Business-2 had value, and were getting nowhere by following the Navy contracting procedures.

### 2. April 2021 Prohibited Contact with Burke

Kim and Messenger were desperate, so they reneged on their pledge to "stand by until we hear from" Burke, who, at that time, was head of the Navy's European and African command. To be clear, Kim and Messenger knew the rules and knew they should not be reaching out to Burke directly—they had been instructed not to on multiple occasions. *See*, *e.g.*, GOVEX 06, 11. Despite knowing the rules, between September 2020 and February 2021 they tried repeatedly to secure a meeting with Burke to promote Company A, a transparent effort to reestablish business with the Navy. *See, e.g.*, GOVEX 24, 27. Eventually, Burke acceded and met with Kim, Messenger, and senior members of Burke's staff on April 8, 2021. *See* GOVEX 28. Burke's civilian Executive Director, "Person 2," attended the meeting and described it as an unremarkable

3

marketing pitch.

Nevertheless, the Defendants had a second meeting via WhatsApp on April 21.    This time only the Defendants participated.    GOVEX 37.    The seeds of the bribery scheme were sown: Kim and Messenger asked for a deal before agreeing to hire Burke.    Within hours of this meeting, Kim, copying Messenger, described the call to senior Company A leadership as "the highest stakes meeting to date and the tiniest wrong move would/could lose all trust-come across slimy." GOVEX 38.    Kim added that, during a short break in the meeting, Messenger said she "felt slimy he wants to work for us but we're asking for a deal first."    *Id*.    About two weeks later, Burke emailed Kim and Messenger stating that Person 2 was "working options and angles hard for funding our project[.]" GOVEX 41.

On May 10, 2021, Kim, with Messenger copied, emailed Burke proposing a $20 million contract for Company A to provide programming applications and programs that had been updated since the Navy declined to continue using Company A's products and services two years earlier. GOVEX 43.    Kim and Messenger had something new to sell, but they needed Burke's helping showing the rest of the Navy and other branches of the military that Company A's product was worth purchasing.

### 3.  *July 23, 2021: Cementing the Quid Pro Quo*

On July 13, 2021, the Defendants exchanged emails to arrange a July 23 lunch meeting in Washington, D.C., GOVEX 47, where they finalized their corrupt arrangement.    Knowing his conduct was a crime, Burke concealed his meeting from the Navy.    Burke arranged the meeting using his personal email account and without copying any Navy personnel.    *Id.*    What's more, Burke's official itinerary for the afternoon of July 23 stated "Executive Time" rather than disclosing a meeting with Company A.    GOVEX 51.    Burke invited Person 3, a personal

companion, to attend the lunch, and told her the meeting was about a job.    GOVEX 53A.    As he wrote in a text beforehand, Kim and Messenger "want to have a more intimate conversation" and "Meghan [Messenger] already talking about [a] job."    *Id.*    And talk about the job they did: At lunch Messenger and Kim, through Company A, agreed to hire Burke with a $500,000 salary and stock options in exchange for the government contract they so desperately sought.    GOVEX 53B.

The Defendants thoroughly memorialized the lunch meeting.    After the meeting, Kim emailed senior Company A personnel and reported, "Burke. Crazy day. Five hours. He would have stayed all night if we stayed. In short [a contract] starting with his command almost ASAP." GOVEX 55.    In the same email, Kim said that they had also discussed Burke coming to work at Company A after his retirement and including "salary equity etc."    *Id.*    Kim reported that Burke was "very excited" and "wanted to resign next week," but Kim "[t]old him to hold off and first launch this part 1," referencing the stage of the agreement in which Burke would direct his staff to provide a contract to Company A.    *Id.*    That evening, Messenger also emailed members of her family, revealing her state of mind as to the unfolding of the illicit agreement with Burke; that is, using his command to springboard to a "bigger deal" with the Navy, followed by Burke joining Company A:

> I'm so out of it so tired longest day of my life in DC was well worth it . . . getting small few million-dollar deal with [Burke] for navy europe deal to prove the result to then get bigger deal and offered [Burke] full time offer wants to be a Company A]er starting next July.  Surreal. A 4stsr [sic] working for us when he retires . . . longest day but worth it . . . . complicated as shit to get this done but goals aligned I can see it happen[.]

GOVEX 57.

What they didn't disclose to anyone outside those at the lunch, was that the Burke's job

was in exchange for a Navy contract.

The next day, July 24, 2021, Burke texted Person 3 that "[Kim] sent me a note  . . . . I asked him to write out a job description – but I've essentially agreed to work for them . . . ."

### a)  The Quid

Why did Burke enter into this illicit agreement?   Describing his own motivation to corruptly agree with Kim and Messenger, Burke indicated that employment at Company A was a "real offer" that would get him "out of the DoD rut."   GOVEX 53B.   And, at bottom, there was the money: Person 3 asked how big an equity stake Kim and Messenger offered Burke, because "[i]t was hard to hear with '500k base salary' ringing in my ears." Burke replied, "10% [ownership] in total co[mpany] … junior coowner behind [Messenger]. . . "   *Id*.   Showing that Burke considered the future equity stake to be a value driver, Burke explained that Kim "wants all his team to own some of the company – so he can pay lower salary and incentive performance through ownership."   *Id.*

Person 3 asked to what extent the job at Company A was "tied" to his providing a Navy contract; Burke answered, "technically - zero.   But he desires that I be able to have a personal testimonial."   *Id.*   In other words, Burke's employment was contingent on providing a contract to Company A so that Burke could attest to Company A's product.   Without that contract, there would be no personal testimony, and no job.   Underscoring Burke's agreement to work for Company A, on August 26, 2021, about a month after the lunch meeting, Defendant Burke sent the Secretary of the Navy a memo announcing his intention to retire from the Navy in May 2022. GOVEX 64.

### b) The Quo

The Defendants developed a three-phased approach to their efforts to unlawfully obtain Navy contracts for Company A.   In Phase One, Burke would take official action to deliver an initial contract for Company A to train a portion of his command, Navy Europe and Africa, to "make data showing results."   GOVEX 58.   In Phase Two, Burke, armed with the results of the initial contract, would influence other senior Navy officials to obtain a second, Navy-wide (and thus more valuable) contract for Company A.   *Id.*   And in Phase Three, Burke would retire from the Navy and join Company A as a Senior Partner.   *Id.*

Throughout the summer of 2021, emails show that Company A was still developing the tech application that it intended to present to the sailors under Burke's command for Phase One of the illegal bribery agreement.   In this context, Messenger emailed select Company A personnel indicating that she and Kim decided to further reduce their $20 million proposal down to a $1 million contract.   GOVEX 66.   Messenger explained, "We don't want Bob [Burke] to get off the hook…the $ amount is less significant at this stage [. . . .] IN our POV [*i.e.*, point of view] the contract size is less important than the things it triggers (including being able to say we're in partnership with the navy)[.]"   *Id.*

But when Company A's product was ready and made informally available to some Navy personnel to "test drive," the results were so bad that on September 22, 2021, Burke emailed Kim and Messenger that Company A's application "in and of itself does not stand on its own" and that the "app-based approach" "just does not seem to be sustainable or scalable for us [*i.e.*, the Navy]." GOVEX 68.   Burke stated that, "I just can't do this as structured."   *Id.*   Tellingly, however, Burke did not close the door to Kim and Messenger; instead, he instructed them how to modify their proposal so that he could ram it through his administration and, in that respect, he offered "to

talk this week or next if helpful." *Id.* Kim then invited Burke to Company A's new and lavish[3] New York City headquarters, and Burke quickly agreed to visit them. *Id.*

> ### 4. Phase One: Burke Performed a Corrupt Official Act on Company A's Behalf to Direct a Contract to Company A

To complete Phase One of their illegal bribery agreement, in mid-December 2021, Burke used his official position as Commander of Navy Europe and Africa to order his subordinates to ensure Company A had a contract with the Navy to provide a training program in Naples, Italy, and Rota, Spain, the following month – an order that Navy contracting officials felt was inappropriate and, under normal circumstances, impossible.

Preceding Burke's official action to direct a contract to Company A, the Defendants continued to meet to discuss their corrupt bribery agreement and finalize its execution. On November 16, 2021, Burke visited Company A's headquarters in New York City. GOVEX 76. Immediately after the meeting, Kim emailed select Company A personnel that the company was about to be "full force back into business with the Navy." GOVEX 77. Kim also described a detailed plan that would work around (but not fix) the significant flaws in Company A's app—the plan was to send four officers under Burke's command to attend an in-person training at Company A and report back to Burke and his senior staff about the program's utility. *Id.* This plan was conceived in deception because the Defendants pre-determined that the contract would be "signed before Xmas" no matter the officers' review of the training. *Id.* Executing the plan would require the assistance of Company A's "Partners" team, whom Kim emailed to "informate" as to

---

[3] Company A's "Flagship" office spanned three floors of a building in the Chelsea neighborhood of New York City. Company A's personal office contained, among other things its own fitness center, basketball court, pilates studio, yoga studio, hair salon, men's and women's lounges, and landscaped terrace.

what transpired in their meeting with Burke:

> [Messenger] and I met for a little over 4 hours today with [Burke]. In short, we're about to go full force back into business with the Navy. We have 4 of his senior most people coming in 2 weeks . . . Within one week [of that visit] . . . he is going to propose back a ~$1MM engagement with [Company A] with goal of having it signed before Xmas. We will likely launch in the new year, the work will be in Naples, Italy and Rota, Spain. We will likely engage our entire Partners team to help with the coaching and training of the pilot Sailor population.

*Id.*  And Kim clearly believed, based on that meeting, that their three-phased plan with Burke was moving forward, as he later wrote to an associate:

> Contract signed before Xmas and then we're off to the races, ideally tangible success by March. Present April/ may for all navy deal to 640k sailors and 5000 commands globally. Then [Burke] ideally leaves navy joins [Company A] somewhere between July-oct next year in nyc.

GOVEX 80.

Messenger confirmed Kim's account of the meeting with Burke.   She forwarded Kim's email to her mother, and explained, "We had a really good 4 hour meeting today with Burke in our office."   GOVEX 78.

Two days later, Messenger emailed Kim alone and expressed her ongoing belief that the conspiracy was driving toward its intended results: "Weird to think Bob [Burke] gonna be on our team likely next summer eh[.]"   GOVEX 81.

In mid-December 2021, Company A personnel were contacting Burke's staff to arrange their travel – even though a contract had not been signed.   When Person 2 learned about this, she wrote, "Why are they coming? We have no contact with them," and then clarified, "I mean contract not contact.   Comptroller is researching possible vehicles, but we don't even have proposals . . . I'm not sure how to stop this direct communication between [Burke] and [Company A]." GOVEX 90.   Nevertheless, on or about December 17, 2021, Burke took official action to fulfill

his end of the illegal bribery agreement and ordered Person 2 to provide a contract for Company A to train to his command. GOVEX 96.  In turn, Person 2 instructed Burke's staff to follow Burke's order, including Burke's directive that the contract be "in place by 10 Jan." *Id*.  Burke's staff had approximately 10 working days to get the contract in place, whereas, in the ordinary course, constructing and implementing federal government contracts takes months.

The training provided by Company A was widely disparaged.  In fact, a post-training survey was compiled showing the mostly negative reviews.  GOVEX 105.

### 5.  *Phase Two: Burke Promotes Company A to Other High-Ranking Officials*

Even though Burke knew that Company A's training received mostly negative feedback, Burke worked to complete Phase Two of the illegal bribery agreement by promoting Company A to other high-ranking officials with the hope that Company A would receive a larger contract in the future.  *See* GOVEX 59.  For example, Burke wrote to a high-ranking Admiral responsible for training sailors throughout the Navy and promoted Company A, asserting that Company A could provide Navy-wide training.  GOVEX 112.   Burke also promoted Company A to a high-ranking foreign official of a Foreign Military.  GOVEX 126.  Of course, in using his official position to advocate for Company A within the Navy, Burke was advancing his own financial interests because he had already agreed to join Company A later that year with a large equity stake. *See e.g.*, 38, 42B, 81.  In other words, Burke's future ownership of part of Company A was incentivizing his performance even before Burke retired from the Navy.

### 6.  *Phase Three: Kim and Messenger Offer Burke a Job at Company A*

Burke fulfilled Phases One and Two of the illegal bribery agreement by taking official action to direct a contract to Company A and by promoting Company A to other high-ranking officials.  It was time for Kim and Messenger to complete Phase Three and hire him.  But first,

10

Kim and Messenger visited Burke and his wife in Naples and stayed at their home.    GOVEX 113, 114.    A few weeks later, Burke received his Company A offer letter, which mirrored the terms discussed at the lunch in July 2023 when the Defendants cemented the *quid pro quo*.    GOVEX 129.    Kim and Messenger offered Burke, and Burke accepted, a position at Company A with a $500,000 base salary and 100,000 stock options. *Id.*

### B.  Burke's Concealment and Conflict of Interest

To fulfill his end of corrupt agreement with Kim and Messenger – and to receive the "real offer" of a lucrative pay package from Company A that would get him out of the "DoD rut" – Burke's responsibility was to direct a contract to Company A and promote Company A to other high-ranking officials.    *See* GOVEX 58.    To be able to do so, Burke could not allow himself to be recused or conflicted out of handling matters concerning Company A.    Accordingly, at no point from July 2021 to May 2022 did Burke report to the Navy that Kim and Messenger had offered him a job at Company A, or that he had discussed with them the possibility of working for Company A as early as April 2021.    On the contrary, Burke actively concealed the job offer while performing certain tasks necessary for him to retire and obtain post-government employment. For example, on August 26, 2021, Burke sent the Secretary of the Navy a memo requesting voluntarily retirement in May 2022, affirming that he was aware of the directive governing pre- and post-retirement standards of conduct and employment activities – and thereby falsely implying that he was following those standards.    GOVEX 64.    Despite knowing he had engaged in job negotiations with Kim and Messenger, Burke implied that he would continue to follow that directive.    *See id.*    But, of course, Burke continued to actively ignore it.

Burke's ethics counselor advised Burke that prior to seeking post-government employment it would be wise to request a post-government employment opinion.    *See* GOVEX 149.    Seeking

a post-government opinion is consistent with typical practice when a high-ranking Navy official is retiring from the Navy and considering post-government employment options. The opinion is intended to ensure that retiring officials do not run afoul of the Navy's code of conduct and the law. On March 28, 2022, Burke emailed his Navy Ethics Counselor ("NEC") to request a generic post-government employment opinion. *Id*. In his March 28, 2022, email to the NEC, Burke falsely stated that he "had no conversations, have no intent to aim for a specific company, and most likely will not actively seek employment until after 1 July." *Id*. Then, on May 6, 2022, Burke again emailed the NEC and falsely implied that Company A had just approached him to ask if he "would be interested in having post-navy employment discussions." *Id*. Burke falsely reported to the NEC that he rejected Company A's entreaty out-of-hand. A few days later, Burke subsequently signed a memorandum disqualifying himself from participating in any matters with Company A, effectively snowing the Navy into believing that Burke's conduct was above board and in line with government ethics rules, with which Burke was intimately familiar. GOVEX 118. By that time, it had been almost ten months since Burke "basically agreed to work for" Kim and Messenger following their D.C. lunch meeting. It had been over five months since Burke ordered Person 2 to provide the contract to Company A. And Burke had already used his position to promote Company A to other high-ranking officials.

In one of his final deceptive acts, in July 2022, Burke withheld material information – his employment agreement – from his mandatory public financial disclosure report (OGE-278e). Burke joined Company A in October 2022. GOVEX 136.

### C.  Kim and Messenger's Concealment

As noted above, Kim and Messenger knew the rules. They could not contact Burke directly about contracting actions and had to follow the Navy's standard policies and procedures.

*See e.g.*, GOVEX 06, 11, 22, 154A-B.   Furthermore, Company A had its own internal "Anti-Bribery and Corruption Policy" intended to prevent the very crimes that Kim and Messenger are accused of committing here.   *See* GOVEX 160.   As instructed in that guidance, Kim and Messenger had to comply with the principle that they could not "offer anything of value to officials intended to influence, obtain, or retain business."   *Id.*   Additionally, Company A's own employee manual had a "Whistle Blower Policy" that instructed employees they would be protected for any disclosure of "an act of bribery or corruption" made in "good faith."   GOVEX 119.   Of course, Kim and Messenger never made any such disclosure—they needed to hide their corrupt agreement with Burke so they could get Company A the contract they so desperately wanted.

## ANTICIPATED EVIDENTIARY ISSUES

At trial, the government intends to call a law enforcement witness and lay witnesses who will present the substantial documentary evidence chronicling the Defendants' bribery, including records obtained from the Navy, Company A, financial institutions, and records showing statements by Defendants.   An overview of much of this evidence, and the grounds for admission, is included in the Government's Trial Brief.   ECF 155 at 11-18.   This supplemental brief will provide additional information and law related to anticipated legal issues particular to this trial.

### A.  Stipulation to Authenticity

Defendants and the government have agreed to stipulate to the authenticity of all documents produced to the defense through discovery.   The records discussed in the sections below all fall within this stipulation.

### B.  Company A Records

The government intends to introduce into evidence records produced by Company A in response to grand jury and trial subpoenas.   Specifically, these records include (a) emails between

Defendants, Defendants and Burke, Defendants and Company A employees and investors; (b) handwritten notes by Defendants; (c) compliance documents; (d) calendar entries; (e) slides from meetings; and (f) recordings of meetings.

The government has requested certifications from Company A that these records are business records within the meaning of Federal Rules of Evidence 902(11) and 803(6).    As of the date of this filing, the government understands that certification is likely to be provided so that a records custodian from Company A need not be called to take the stand at trial.

In the event that Company A takes the view that certain emails previously produced may not be certified as business records, the government may nevertheless offer their admission, on a case-by-case basis, on one of the following grounds.    *First*, that the email in question is in fact a business record because the elements to establish the applicability of the rule are met based on other evidence in the record.    *See DL v. District of Columbia*, 820 F. Supp.2d 27, 29 (D.C. 2011) (concluding that email chains were business records within the meaning of Rule 803(6)); *United States v. Daneshvar*, 925 F.3d 766, 777 (6th Cir. 2019) ("Of course, an email can qualify as an admissible record of a regularly conducted business activity as long as the proponent satisfies the requirements of Rule 803(6)"); *United States v. Cone*, 714 F.3d 197, 220 (4th Cir. 2013).    *Second*, that it demonstrates a party's then-existing state of mind under Rule 803(3).    *Third*, that it falls within Rule 807's residual exception to the hearsay rule because (1) the statement is supported by sufficient guarantees of trustworthiness, and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.    The government may also offer certain emails not for the truth of the matter asserted.

### C. Testimony by law enforcement agents

#### 1. Government's Case

The government intends to call FBI Special Agent Sebastian Gardner to provide the jury with the background of the government's investigation, including the tools used to gather evidence, and a summary of certain admissible evidence. Courts routinely admit this type of testimony in criminal trials (including the trial of Co-Conspirator Burke). *See* ECF 201 at 2-8 (citing cases).

#### 2. Defendant's Case

Defendants have signaled their intent to call as witnesses sixteen other law enforcement agents and investigators involved in the investigation and/or prosecution of this case.[4] To the extent Defendants want to add background facts to Special Agent Gardner's overview, that may have limited relevance—especially since Defendants will have the opportunity to cross-examine Special Agent Gardner. But to the extent Defendants wish to call the agents simply to impeach them or the government's investigation, Courts—including this one—have placed clear limits on this type of evidence.

*First*, to be admissible, evidence must make a fact at issue more or less probable. Fed. R. Evid. 401. The jury in this case is tasked with finding facts about whether Defendants committed conspiracy and bribery, not render a verdict on the government's investigation. *See United States v McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's

---

[4] To call these law enforcement agents and investigators, and any other government employees, to testify at trial, Defendants must also have complied with the *Touhy* regulations. *See e.g.* 32 C.F.R. § 97.3; 28 C.F.R § 16.21; *see also United States v. Wallace*, 32 F.3d 921, 929 (5th Cir. 1994) (applying Department of Justice Touhy regulations); *United States v. Allen*, 554 F.2d 398, 406 (10th Cir. 1977) (same).

investigation."). Even evidence showing that a government's investigation was "sloppy" is not enough to establish relevance; it must be directly tied to a fact at issue. *United States v. Patrick*, 248 F.3d 11 (1st Cir. 2001) (distinguishing between potentially admissible evidence about the destruction or preservation of evidence and broad allegations of inadequacy, which was inadmissible); *McVeigh*, 153 at 1192 (evidence of a "shoddy" investigation properly excluded where defendant could not establish any connection between the investigation and any evidence adduced at trial).

*Second*, the probative value of the evidence must not be outweighed by the risk of confusing the jury or creating a mini-trial on collateral issues. Under this principal, the Court has already ruled that evidence related to investigation or prosecution of other individuals is inadmissible at this trial. July 25, 2025, Pretrial Transcript 16:22-17:9 (citing *United States v. Re*, 401 F.3d 828, 833 (7th Cir. 2005)). Whether other individuals were or were not charged for similar conduct (selective prosecution arguments) are of limited probative value in this criminal trial, because they do not make it more or less likely that Defendants engaged in the conduct outlined in the Indictment. July 25, 2025, Pretrial Conf. 17:23-18:7 (citing *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir. 1973)). Whatever slight evidentiary value this evidence has is likely outweighed by the risk of confusing the jury. *Id.*

Under this same reasoning, generalized allegations of misconduct unrelated to this case must also be precluded. Whatever probative value these questions have as to the witnesses' truthfulness—which is limited, given the fact that the government did not call the witnesses in its case-in-chief—the risk is too great that the jury is confused or mislead. *See United States v. O'Neal*, 844 F.3d 271, 276 (D.C. Cir. 2016).

*Third*, the evidence must be related to an issue of fact, not a legal issue outside the province of the jury.    For example, the Court, not the jury, considers issues of misconduct.    July 25, 2025, Pretrial Conf. 17:23-18:7 ("[T]he question of misconduct is not one for the jury and the defense has not come forward with any corroborate accusations of misconduct."); *see also United States v. Guzman Loera*, 24 F.4th 144, 160-61 (2d Cir. 2022) (concluding that the trial court rightly excluded defendant's arguments of improper motive and accusations that the government suborned perjury, where the court had already rejected the selective prosecution defense prior to trial).

### D.  Alleged Misconduct by Special Agent Cordell "Trey" De La Pena

Any attempt to bring in evidence or argument about alleged misconduct by Special Agent De La Pena must be limited, particularly since he is not going to be called as a witness at trial.

### a)  Allegations of Misconduct in Other Proceedings

Defendants have already attempted to make much of Special Agent De La Pena's involvement in investigations unrelated to this matter.    *See* ECF 176 (describing Special Agent De La Pena's involvement in *United States v. Rafaraci*, 21-cr-00610 (D.D.C.) and *United States v. Newland*, 17-cr-00623 (S.D. Cal.)).

Records from the *Rafaraci* and *Newland* investigations are inadmissible at trial for several reasons.    *First*, Rule 608(b) unambiguously prohibits the admission of extrinsic evidence to prove a witness's character for untruthfulness or rebut a witness's denials.    *United States v. Whitmore*, 359 F.3d 609, 618 (D.C. Cir. 2004) ("[T]he purpose of [Rule 608(b) is to prohibit things from getting too far afield –to prevent the proverbial trial within a trial.").    And since Special Agent De La Pena will not be the witness on the stand, the extrinsic evidence will be even farther afield. *Second*, the records are hearsay.    *See, e.g.*, *United States v. Avalos-Diaz*, No. 8:22-CR-139, 2023 WL 5124985, at *2–3 (D. Neb. Aug. 10, 2023) (declining to allow a defendant to introduce an

Eighth Circuit ruling on a testifying agent's credibility).    *Finally*, even if they are admitted, the government is not offering Special Agent De La Pena's testimony to prove any fact at trial, so evidence about his character for truthfulness is probative only about his previous role in the investigation.    As discussed below, his "truthfulness" in the search warrant affidavits is not for the jury to decide.    That leaves very limited probative value in any attack on his "truthfulness" in the investigation.

As discussed in previous briefing, *see* ECF 201, 219, 236, to the extent testimony or argument is allowed on Special Agent De La Pena's role in the *Rafaraci* and *Newland* cases, it must be limited.    The facts underpinning *Rafaraci* and *Newland*—and their tenuous relationship to the fact at issue in this trial—are a textbook example of a Rule 403 violation.    As discussed below, issues with Special Agent De La Pena's role in the search warrant are not before the jury. There is no credible evidence of misconduct in this investigation.    July 2025 Pretrial Conference at 18.    The time and explanation necessary to lay out the facts in the *Rafaraci* and *Newland* cases risks a trial within a trial on topics that do not make it more or less likely that Defendants committed the crimes they have been charged with.

### b)  Allegations Regarding Insufficiency of Search Warrant Affidavit(s)

For several reasons, Defendants must not be allowed to offer evidence or argument about deficiencies with the search warrant.    *First*, the appropriate relief for issues with the search warrant affidavits is a motion to suppress the evidence from the search warrants.    *See* Fed. Rule Crim. P. 12(3) (setting forth motions that must be made before trial, including a motion to suppress evidence).    Defendants filed such a motion, including arguing Special Agent De La Pena's alleged misconduct in the *Rafaraci* matter was related to the alleged omission of facts from the search warrant.    *See* ECF 61 (Defendants' motion to suppress).    The Court considered the issue

18

and concluded that any omissions from the search warrant affidavit were not "material to the issue

of probable cause."    ECF 150 at 2 (citing *United States v. Richardson*, 861 F.2d 291, 293 (D.C.

Cir. 1988)).    *Second*, any evidence or argument about Special Agent De La Pena's search warrant

affidavits risks confusing the jury into believing that they are being asked to weigh in on the

sufficiency of the search warrants conducted in this case.    This risk significantly outweighs what

limited probative value testimony on this point might have for the fact issues to be decided at trial.

*Third*, legal conclusions about the sufficiency of the search warrant affidavits are not within the

province of the jury.    The government requests that if Defendants stray into this topic, the Court

give a contemporaneous instruction to the jury that they need not consider the validity of any legal

process as part of their fact-finding.

### E.  Self-Serving Hearsay

The government's evidence includes statements made by Defendants, which are not

hearsay because they are admissions by party-opponents pursuant to Federal Rule of Evidence

801(d)(2).[5]    When introduced by Defendants (whether in their case, the government's case, or

opening statement/closing argument), such Defendant out-of-court statements offered for the truth

of the matter asserted are barred by the rule against hearsay.    *United States v. Wilkins*, 538 F.

Supp.3d 49, 68 (D.D.C. 2021) ("While the Federal Rules of Evidence set forth various exceptions

---

[5] The government may elect not to admit certain statements by Defendants it deems to be
misleading, confusing, or self-serving, which occurred in the same context as statements offered
for admission.    The "rule of completeness" codified in Rule 106 provides that "when a writing or
recorded statement thereof is introduced by a party, an adverse party may require the introduction
at that time of any other part or any other writing or recorded statement which ought in fairness to
be considered contemporaneously with it."    *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir.
1996).    In order to be admissible pursuant to Rule 106, however, the evidence must (1) be a written
or recorded statement, not a conversation; (2) must be offered to clarify or explain testimony
already received; and (3) be otherwise admissible.    *Id.*

to hearsay, self-serving hearsay is not one of those).    This preclusion extends to testimony about

prior oral statements, *see, e.g.*, *id.*, as well as emails and other records of communications, *see,*

*e.g.*, *United States v. Morris*, No. CR 5:21-014-DCR, 2021 WL 4228883, at *6 (E.D. Ky. Sept.

16, 2021) (precluding self-serving hearsay in emails, letters, and text messages of defendant).

### F.  Character Witnesses

Defendants have signaled that they may call character witnesses, including Company A

employees and investors.    Rule 404 precludes evidence of a person's character or trait for the

purpose of showing action in conformity therewith on another occasion, except that a defendant in

a criminal case is permitted to "offer evidence of the defendant's pertinent trait."    Fed. R. Evid.

404(a)(2)(A).    Pertinent traits are those relevant to an element of the offense.    *United States v.*

*Sutton*, 636 F. Supp.3d 179, 207-08 (D.C. 2022).    The Court has concluded that Defendants may

introduce themselves to the jury and may offer limited evidence of general reputation or opinion

character evidence relating to their honesty.    July 25, 2025, Pretrial Conf. 16:10-21 (explaining

that the Court "won't entirely bar the defense from introducing general reputation or opinion

character evidence).    If Defendants offer evidence pursuant to Rule 404(a)(2)(A), it opens the

door for the government to rebut that evidence.

Other than the categories already enumerated by the Court, evidence of other instances of

lawful behavior or good acts is irrelevant.    *See, e.g., United States v. Burke*, 781 F.2d 1234, 1243

(7th Cir. 1985).    *United States v. Gracely*, 840 F.2d 1156, 1164 (4th Cir. 1988) ("Evidence of

specific good acts is not admissible.") (citing Fed. R. Evid. 405)).    Moreover, evidence of prior

lawfulness risks confusing the jury about the issues before it.    *United States v. Morgan*, 2000 WL

1622748, at *10 (E.D. Pa. Oct. 20, 2000); *see also United States v. Grimm*, 568 F.2d 1136 (5th

Cir. 1978).    Defendants may not "seek to establish [their innocence . . . through proof of the

20

absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990); *see also United States v. Rosen*, 2005 WL 5925549, at *1 (E.D. Va. Nov. 5, 2005) ("[T]he absence of criminal conduct at certain times is not relevant to the existence of criminal conduct at other times.").

### CONCLUSION

The government offers this Supplemental Trial Brief to supplement for the purpose of assisting the Court in preparing for trial and to put both the Court and Defendant on notice as to anticipated issues so as to streamline the trial.    It supplements the Government's Trial Brief, ECF 155, as well as the briefing on Motions *in Limine*, ECF Nos. 201, 219, 236.


JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By        /s/
Rebecca G. Ross (NY Bar No. 5590666)
Brian P. Kelly (DC Bar No. 983689)
Joshua S. Rothstein (NY Bar. No. 4453759)
Sarah Santiago (GA Bar No. 724304)
Sarah Ranney (NY Bar No. 5050919)
Assistant United States Attorneys
601 D Street NW
Washington, DC 20530
Office: (202) 252-4490