## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:24-cr-00265 (2)(3) (TNM)** |
| | : | |
| **YONGCHUL "CHARLIE" KIM and** | : | |
| **MEGHAN MESSENGER,** | : | |
| | : | |
| **Defendants.** | : | |

### UNITED STATES' *MOTION IN LIMINE* TO ADMIT CERTAIN EVIDENCE

Motions *in limine* are "designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Graves v. District of Columbia*, 850 F.Supp.2d 6, 10 (D.D.C. 2011) (internal citations omitted). Accordingly, consistent with governing law, and to promote efficiency at trial, the United States of America respectfully moves *in limine* for an Order permitting it to introduce at the retrial scheduled to begin on April 29, 2026, limited evidence about (1) the quality of Next Jump's products and training provided to the United States Navy; and (2) the speed with which Next Jump's contract was approved and finalized. For the reasons discussed below, this evidence is relevant pursuant to Federal Rule of Evidence of 401, and its probative value is not substantially outweighed by a danger of undue delay, wasting time, or needlessly presenting cumulative evidence pursuant to Federal Rule of Evidence 403.

The United States also respectfully requests an Order permitting it to admit relevant portions of the transcript of Defendant Kim's prior sworn testimony from the August 2025 trial in this case. For the reasons discussed below, Kim's prior sworn statements are admissible against him as non-hearsay statements by an opposing party. *See* Fed. R. Evid. 801(d)(2)(A).

## I.      Background

On August 18, 2025, the Defendants, Yongchul "Charlie" Kim ("Kim") and Meghan Messenger ("Messenger"), proceeded to trial, facing one count of conspiracy, in violation of 18 U.S.C. § 371, and one count of bribery, in violation of 18 U.S.C. § 201(b)(1), for their role in bribing their co-Defendant Robert Burke ("Burke"), a former four-star Navy Admiral.  As alleged, the Defendants exchanged a job at their company, Next Jump, for Burke's help securing a Navy contract with his command in or about December 2021 to January 2022.

Following an eleven-day trial, the Court declared a mistrial, finding that the jury was deadlocked and could not reach a verdict.  After declaring a mistrial, the Court stated, "my inclination if we're going to retry this would be that I would be inclined to significantly limit evidence regarding how Next Jump's training was received at DOD."  *See* 9/10/2025 Trial Tr. at 9:19-22.  The Court went on to say of this evidence, "[a]nd the probative value, I think, at this point for these Defendants seems pretty minimal[, and s]o my inclination would be to agree now with the defense initial view that that is not relevant and bar testimony from either side on that issue."  *Id.* at 10:1-5.  This Court further stated it would be:

> [S]trongly inclined to bar evidence about the quick turnaround of … the holiday contract.  I think the defense ably pointed out that that was actually perhaps exactly the same number of days that a prior contract was approved within.  And so, again, I think the probative value is pretty minimal compared to the amount of time we spent hearing from various witnesses about that.

*Id.* at 10:8-14.  The Court made clear, however, that these statements were not rulings.  *Id.* at 9:18; 10:15.

## II.     Evidence of the Negative Reviews of Next Jump's Products and Training and the Speed with Which the Navy Implemented Next Jump's Contract is Relevant Pursuant to Rule 401 and Should Not be Excluded Pursuant to Rule 403.

During the first trial, the Government presented witness testimony and exhibits that demonstrated that Next Jump's products and training were not a good fit for the Navy and were

poorly received, and that Burke was aware of that both before and after he awarded the January 2022 contract. The Government also presented evidence concerning the speed with which that contract was approved and finalized. This included testimony and exhibits presented through Juliet Beyler, Burke's executive director, Amanda Kraus, a Workforce Development Specialist who was tasked with implementing the Next Jump contract by January 2022, and Pamela Hooker, a Training Administrator who was originally tasked with helping Kraus. For the reasons discussed below, limited testimony about the negative reviews and opinions of Next Jump's products and training, and about the speed with which the contract was implemented, from Beyler, Kraus, and Hooker, is admissible pursuant to Federal Rules of Evidence 401 and 403.

### a. Legal Precedent

"Evidence is relevant if it has *any tendency* to make a fact [of consequence in determining the action] more or less probable than it would be without the evidence[,]" Fed. R. Evid. 401 (emphasis added), and the threshold for finding evidence to be relevant under Rule 401 is low, *see, e.g.*, *United States v. Moore*, 590 F. Supp. 3d 277, 283 (D.D.C. 2022) (noting Rule 401's "liberal relevance standard," and explaining that "[t]he degree of probative value required for evidence to be admissible under Rule 401 is 'very low'" (quoting *United States v. McVeigh*, 153 F.3d 1166, 1190 (10th Cir. 1998))); *United States v. Slatten*, 310 F. Supp. 3d 141, 145 (D.D.C. 2018) ("[E]vidence need not be dispositive of an element of the crime to be relevant, it must merely cross the low threshold prescribed by Rule 401.").

Even when evidence is relevant pursuant to Rule 401, it may nonetheless be excluded under Rule 403 if, as pertinent here, its "probative value is *substantially outweighed* by a danger of ... undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added); *United States v. Straker*, 800 F.3d 570, 589 (D.C. Cir. 2015). However, Rule

403 imposes a "high barrier to justify the exclusion of relevant evidence[,]" *United States v. Lieu*, 963 F.3d 122, 128 (D.C. Cir. 2020), and it "tilts … toward the admission of evidence[.]" *United States v. Moore*, 732 F.2d 983, 989 (D.C. Cir. 1984).

### b. The Court Should Allow Limited Evidence about the Negative Opinion of Next Jump's Products and Training

#### i. Evidence about the Negative Opinion of Next Jump's Products and Training is Relevant and Highly Probative

The negative opinion of Next Jump's products and training is relevant and highly probative because Kim and Messenger were told by Navy personnel that the Next Jump products and training were a bad fit—but Kim and Messenger persisted in contacting Burke about a contract.  This demonstrates that Kim's and Messenger's primary motivation was to get a revenue-generating leadership training contract with the Navy that would provide a foot in the door for other contracts, regardless of whether their products were a good fit for the Navy.  This desperation—leading to their complete disregard for their product and its true usefulness to the Navy—goes directly to Kim's and Messenger's intent to enter the conspiracy with Burke.  It proves that Kim and Messenger would do whatever it took to obtain a contract, even if it meant bribing a four-star Navy admiral.

The evidence presented by the Government would certainly allow a rational juror to draw a reasonable inference that Kim and Messenger were aware of the negative feedback at the Navy, or at the very least that their product was not a good fit.  Indeed, following the mistrial, members of the jury from the first trial told counsel that the negative opinions about Next Jump—and Burke's disregard of that—was compelling evidence that they considered in their deliberations.  This fact alone demonstrates that the evidence is relevant and that its probative value is far from substantially outweighed by the time it would take to present limited evidence on this point.

The negative opinions about Next Jump also go directly to Burke's state of mind. Evidence that Burke was aware that other Navy personnel considered the services to be a poor fit for the Navy, but nonetheless ordered his subordinates to ensure a contract with Next Jump was in place in fewer than ten business days, is inextricably intertwined with the charges against Kim and Messenger. *See United States v. McPartland*, 81 F.4th 101, 115 (2d Cir. 2023) ("Evidence of a co-conspirator's state of mind may be relevant to explain how a criminal enterprise developed, to help the jury understand the basis for the coconspirators' relationship of mutual trust, or to complete the story of the crime on trial." (quotation marks and citations omitted)); *United States v. Sans*, 731 F.2d 1521, 1532 (11th Cir. 1984) (overruling defendant's objection that certain evidence admitted at trial was irrelevant because, *inter alia*, the evidence "was relevant to the issue of [the codefendant's] criminal intent regarding the conspiracy[, and s]ince [the codefendant] was an alleged coconspirator, his state of mind was relevant"). Indeed, the fact that Burke ordered his subordinates to contract with Next Jump, despite the negative feedback and the consensus that Next Jump could not be scaled to work for the Navy—and thus, was a waste of everyone's time and taxpayer money—goes directly to Burke's criminal intent. It demonstrates that he did not intend to act in the best interest of the Navy, but rather intended to ensure the success of his corrupt bribery agreement with Kim and Messenger. Burke's criminal intent is undoubtedly relevant to Kim's and Messenger's criminal intent, and necessary for the jury to understand the nature of the charged conspiracy. *See id.*

Finally, at Burke's sentencing hearing, the Court also seemed to think that this evidence mattered:

> But much of your conduct was in plain sight, because you knew you were senior enough and respected enough to get away with it. So you could steamroll your subordinates and order them to award a contract in a few weeks' notice even when they had repeatedly raised concerns about the suitability of this contract.

…

And you could promote Next Jump to other senior leaders in the Department of Defense and other militaries despite your blatant conflict of interest and the poor results from the 2022 NAVEUR training, knowing that no one would question or dispute your characterizations.

9/16/2025 Sentencing Tr. at 64:15-65:6.

### ii. The Limited Evidence

The Government should be allowed to present the following witness testimony and exhibits. The evidence discussed herein is a small subset of the evidence the Government introduced at the first trial, so as to streamline the evidence and avoid any undue delay, while ensuring the Government is not prevented from presenting necessary and important evidence of the co-Defendants' state of mind, as described above.

### 1. Juliet Beyler's Testimony

Juliet Beyler should be allowed to present limited evidence about the negative opinions of Next Jump's products and training.  This evidence should include that in the early stages of Next Jump's 2019 Pilot Program with the Navy, both she and Burke were enthusiastic about the product, 8/19/2025 AM Trial Tr. at 31:15-19, but that her opinion changed after the one-year pilot period ended because it became clear to her and others at the Navy that it would not be feasible to use Next Jump's product more broadly, *id.* at 32:9-33:9.  Beyler should be allowed to explain that Burke came to the same conclusion that following the 2019 Pilot Program the Navy could not use Next Jump's product to scale.  *Id.* at 33:22-34:1.  Ultimately, the Navy did not extend Next Jump's 2019 pilot contract because, "we didn't think it was scalable or feasible or something that we wanted to proceed with Navy-wide," *id.* at 36:23-37:1, and Burke was notified of that decision, *id.* at 38:19-21.

After Next Jump's 2019 Pilot Program ended, Kim and Messenger continued to reach out to Burke. Beyler should be allowed to testify that, in February 2021, when she saw Kim and Messenger had emailed Burke, she "felt a little frustration" because "she was just struggling to understand how we could use it across the Navy to address some of the things we needed." *Id.* at 71:13-15. As Burke began to engage with Kim and Messenger, and set up meetings, Beyler did not feel any differently about whether Next Jump's products were a good fit for the Navy, *id.* at 78:25-79:3, the Navy was already working with another company that did not require the technology that made Next Jump a bad fit, 8/19/2025 PM Trial Tr. at 9:16-10:1, and she had conveyed that to Burke, *id.* at 11:12-13:5. In September 2021, Beyler had several Navy personnel look at Next Jump's product and provide feedback, which she provided to Burke, and the feedback was that the product was not helpful. *Id.* at 29:11-36:20; *see* GOV EX 65.

In November 2021, Burke ordered four Navy officers to attend Next Jump's Leadership Academy. Beyler should be allowed to testify that the feedback from those four officers of that Leadership Academy was "mixed" because even though the officers enjoyed the training, there was still the question of whether it was possible to scale Next Jump's product and apply the techniques. *Id*. at 54:15-21.

After Next Jump conducted the training at Burke's command in Naples, Italy, in January 2022, Beyler received an email, GOV EX 106, which contained the feedback from personnel who had attended the training. Beyler should be allowed to testify that the feedback was generally negative, 8/19/2025 PM Trial Tr. at 79:19-80:11, and that she provided the feedback to Burke, *id.* at 82:11-13. After receiving that feedback, extending the contract with Next Jump was a "hard no" based off Beyler's opinions, past experiences, and feedback from the staff. *Id.* at 82:14-83:6.

This evidence is relevant pursuant to Rule 401 and probative under Rule 403 because it shows that Burke knew Next Jump was not the right fit for the Navy—Beyler told him as much—but because of his criminal intent, he ordered the contract regardless. It shows Burke was so desperate to fulfill his end of his corrupt agreement with Kim and Messenger that he disregarded the negative opinions of Next Jump and its uselessness to the Navy on a large scale. It also provides important context to the jury, and it would allow a rational juror to draw reasonable inferences about Kim's and Messenger's knowledge, intent, and state of mind.

### 2. Amanda Kraus's Testimony

Amanda Kraus should be allowed to present limited evidence about the negative opinions of Next Jump's products and training. This evidence includes testimony about the staffing package that she created to send to those in her chain of command. 8/21/25 Trial Tr. at 94:11-13; GOV EX 105. Kraus provided an evaluation of that feedback, which included noting that participants in the training felt, among other things, there was an "unclear objective" and that the "facilitators were ineffective, unclear, unengaging, and poorly organized." *Id.* at 120:12-15. Kraus should be allowed to testify that "in terms of numbers and data, it was one of, if not the worst, training in terms of survey results." *Id.* at 120:24-121:2.

Kraus's testimony about the survey results is relevant and highly probative. As Beyler testified, this feedback was provided to Burke. 8/19/2025 PM Trial Tr. at 82:11-13. Despite this being "one of, if not the worst" feedback Kraus had received for a training, Burke continued to promote Next Jump to other high-ranking officials, both inside and outside of the Navy. This again shows Burke's criminal intent—why would he promote a product that he knew was so fundamentally flawed and poorly received? Burke had no choice. Despite the negative opinions of Next Jump, Burke had to continue to promote Kim's and Messenger's company to other high-

ranking officials because that was part of the corrupt agreement he made with Kim and Messenger. Allowing this testimony and evidence from Kraus will not cause undue delay or otherwise run afoul of Rule 403.

### 3. Pamela Hooker's Testimony

Pamela Hooker should be allowed to present limited evidence about the negative opinions of Next Jump's product and training. Hooker should be allowed to testify that the proposal that Next Jump sent to Burke, *see* GOV EX 93, "looks like a kindergartner wrote it. It was not professional. Their examples were ridiculous … that's not a proposal to the United States Navy." 8/26/25 PM Trial Tr. at 80:1-4. Hooker should be allowed to explain that "at first, I thought somebody was messing with me. It was just disbelief. I could not believe that they would submit this and really call it a proposal." *Id.* at 81:16-17. Hooker's testimony should include that she was concerned about providing a sole source justification for Next Jump's contract because "she could not find a valid reason to use them. Their proposal was childish. Their pricing information was unclear. And at one point I told my team I don't think just because Admiral Burke wants it is a good enough reason to contract with them, because I couldn't find any other reason to contract with them." *Id.* at 85:9-14. It should also include that Hooker did not want her name attached to the contract because she believed, as she told her colleagues, "'[t]his is a bad company.'" *Id.* at 85:24-86:2.

Hooker's testimony about Next Jump's proposal is highly probative to the crimes charged. The fact that someone as experienced as Hooker looked at the contract proposal and did not see a valid reason to pursue a contract with Next Jump indicates that the only reason the Navy contracted with Next Jump was because Burke issued the order. Again, this demonstrates that Burke was on a mission to fulfill his end of the corrupt agreement and was willing to ignore Navy standards to

ensure he did so.  It also demonstrates that Kim and Messenger were motivated to bribe Burke because they knew he had the power to order his command to give them a contract.

Hooker's testimony on this point would take a minimal amount of time.  It is also not cumulative because it provides a different point of view from someone experienced with reviewing vendors and proposals—her testimony and the relevant exhibits help prove that contracting with Next Jump was completely out of the ordinary.  And, of course, it was out of the ordinary because Burke had been bribed.  As such, Hooker's testimony would not run afoul of Rule 403.

  **c. This Court Should Allow Limited Evidence about the Speed with which Next Jump's Contract was Approved and Finalized**

   **i. Evidence about the Speed with which Next Jump's Contract was Approved and Finalized is Relevant and Highly Probative**

The speed with which Next Jump's contract was approved and finalized is similarly relevant and highly probative because it goes directly to Burke's state of mind.  This evidence demonstrates that Burke needed to fulfill his end of the corrupt agreement as soon as possible before he retired from the Navy to go work at Next Jump.  *See* GOV EX 30.  The evidence about the speed with which Next Jump's contract was approved and finalized proves that Burke's order was so unprecedented that it usurped the Navy's standard policies and procedures in ways that experienced employees had never seen before.  This evidence is highly probative because it indicates that Burke was not acting in the Navy's best interest, but rather was acting in the best interest of himself, Kim, and Messenger.  This evidence undoubtedly clears the hurdle of being relevant to the charges in this case, and the probative value of presenting limited evidence on this point is not substantially outweighed by the time it would take to do so.

And again, just as they did concerning the negative feedback about Next Jump, following the mistrial members of the jury from the first trial told counsel that Kraus's and Hooker's testimony about the unusual speed with which the contract was implemented was compelling

evidence, at least for some jurors.  At Burke's sentencing hearing, the Court also seemed to think that this evidence mattered:

> But much of your conduct was in plain sight, because you knew you were senior enough and respected enough to get away with it.  So you could steamroll your subordinates and order them to award a contract in a few weeks' notice even when they had repeatedly raised concerns about the suitability of this contract.

9/16/2025 Sentencing Tr. at 64:15-20.  Again, Kim and Messenger were also undoubtedly aware of this fact, which is exactly why they pursued and ultimately bribed Burke.  And that is surely a reasonable conclusion that a rational juror could reach based on the evidence the government seeks to introduce.

The Court also noted:

> But both your co-conspirators and you needed it to be scalable into something that could be pushed out to sailors across the Navy so that you could justify bigger contracts, which would mean more profits for you and Next Jump.  And you also needed this to happen quickly before your retirement date and the mandatory cooling-off period that would prevent you from working as a contractor with the Navy.  So you pushed the $355,000 contract through, assuring Next Jump of its success even before your four deputies had gone through the leadership training course.  And you pressured your subordinates to finalize the contract, sweeping aside normal protocols and the obvious priorities of a potential looming war.

*Id.* at 65:11-24.  Again, evidence of Next Jump's poor fit with the Navy, and the speed with which the latter contract was implemented, goes to the core of the charged corrupt agreement between Burke, Kim, and Messenger.

### ii.  The Limited Evidence

Beyler, Kraus, and Hooker should be allowed to present limited evidence about the speed with which the Navy was expected to contract with Next Jump.  This should include Beyler's testimony that "the idea" that the Navy could implement a contract with Next Jump by January was a "big stretch."  8/19/2025 PM Trial Tr. at 69:18-20.  It should also include Kraus's testimony that in her experience, from start to finish, implementing a contract with a vendor is "definitely a

six-month process.  It can be longer depending on the complexity of the requirements." 8/21/2025 AM Trial Tr. at 94:11-13.  She further explained that she was "shocked" that she was expected to meet the January 2022 deadline to have a contract with Next Jump in place because it was "less than ten business days to basically start and finish an entire acquisition process." *Id.* at 96:18-20. When asked to compare the timeframe for the earlier Next Jump contract and the 2022 Next Jump contract, Kraus made clear that the 2022 contract was a "herculean" effort, *id.* at 33:18, and further described the timeframe in which she had to implement the 2022 contract as very different because of the holidays and the fact they were working with a "skeleton crew," *id.* at 29:17-23. Additionally, Hooker should be allowed to testify that she "didn't think it was possible" to meet the deadline to get the contract in place.  8/26/2025 PM Trial Tr. at 82:12.

This evidence is highly probative because it shows that Burke's order was atypical and that the staff, because of this order, had to act outside of typical policies and procedures to ensure they met Burke's demand.  Evidence of this atypical contracting process further demonstrates that, absent Burke's criminal intent, the contract with Next Jump never would have happened.  While at trial the Defendants argued that their contract in 2018 took about the same amount of time to implement, Hooker dispelled any truth to that argument.  *See* 8/21/2025 AM Trial Tr. at 29:17-23, 33:18.  As she explained, ensuring the 2022 contract was in place by Burke's deadline required a "herculean" effort due to the holidays and the "skeleton crew" that was in the office.  Comparing the time it took the 2018 and 2022 contracts to finalize is comparing apples and oranges.

### III.    The Could Should Admit Relevant Portions of the Transcript of Kim's Prior Sworn Testimony

Kim provided sworn testimony during the first trial.  *See* 8/28/2026 AM Trial Tr. at 76 – 9/2/2026 PM Trial Tr. at 92.  Those statements are admissible against Kim as non-hearsay statements by an opposing party under Federal Rule of Evidence 801(d)(2)(A), which provides

that a statement is not hearsay if it is "offered against an opposing party" and "was made by the party in an individual or representative capacity[.]" *See, e.g.*, *United States v. Ndubuisi*, 460 F. App'x 436, 439-40 (5th Cir. 2012) (holding that the transcript of the defendant's testimony from the first trial that ended in a mistrial was admissible on retrial, and rejecting the defendant's arguments that the prior testimony was hearsay and not an admission because his statements were not inculpatory) (citing cases).  To be clear, the Government does not intend to introduce all of Kim's statements from the first trial—or even a substantial portion of them.  Rather, the Government intends to introduce portions of Kim's prior testimony as to discrete topics such as, *inter alia*, the July 2021 meeting at Belga Café, and his deletion of communications between himself and Burke.

To the extent that Kim's trial testimony is admissible against only him and not against Messenger, the Court can and should give a limiting instruction to the jury cautioning them to only consider evidence admissible against each defendant in determining the guilt or innocence of that defendant, and specifically that statements made by Kim in the earlier proceeding are to be considered only against him and not Messenger.  Such a limiting instruction would be sufficient insofar as none of Kim's statements from the first trial constitute the types of facially incriminating statements by a codefendant at issue in *Bruton v. United States*, 391 U.S. 123 (1968), and its progeny.  *See United States v. Benson*, 957 F.3d 218, 228–29 (4th Cir. 2020) ("Ultimately, when *Bruton* is not implicated, the assumption is that jurors follow any limiting instructions, including considering an opposing party statement strictly against the party who made it.") (citing *Richardson v. Marsh*, 481 U.S. 200, 208-09 (1987)).

### IV.    Conclusion

For the reasons stated herein and any that may be raised in a hearing on pretrial motions, the Government respectfully requests that the Court admit limited evidence about (1) the quality of Next Jump's products and training provided to the Navy; and (2) the speed with which Next Jump's contract was approved and finalized.

The Government also respectfully requests that the Court admit certain statements by Kim from the first trial against himself as statements by a party opponent, pursuant to Federal Rule of Evidence 801(d)(2)(A), without limitation to other non-hearsay purposes for which the statements may be admitted.

Respectfully submitted,

JEANINE FERRIS PIRRO
UNITED STATES ATTORNEY

By _____/s/_____
Brian P. Kelly
Rebecca G. Ross
Sarah W. Ranney
Assistant United States Attorney
601 D Street N.W.
Washington, DC 20530
Office: (202) 252-4490